State ex rel. Case v. Public Serv. Comm.

# THE STATE ex rel. MARY B. CASE et al. v. PUBLIC SERVICE COMMISSION OF MISSOURI, KANSAS CITY LIGHT & POWER COMPANY et al., Appellants.

### Division One, April 6, 1923.

1. **JOINT ELECTRIC AND STEAM-HEATING PLANT:** *Going or Intangible Value:* **Separate Finding by Commission.** In apportioning the valuation and operating expenses of a joint steam-heating and electric-lighting plant, for the purpose of determining rates for steam heat and electricity, the Public Service Commission is not required by the statute to make a separate finding of the going-concern or intangible value, where such value cannot be accurately separated and stated by itself apart from the physical value of property. In such case the value of the plant and business is an indivisible gross amount, and the going value is practically inseparable. And particularly should this be the ruling where there is no evidence of the going-concern value.

2. ———: **Findings of Commission: Trial De Novo in Appellate Court.** The findings of the Public Service Commission are not binding on the Supreme Court, any more than are the findings of a chancellor in a suit in equity.

3. ———: ———: **Burden.** The burden is on the party attacking rates for a public utility fixed by the State Public Service Commission to show, by clear and satisfactory proof, that they are unreasonable or unlawful.

4. ———: ———: **Going Value: Unprofitable Years.** Where the business of the joint steam-heating and electric-light plant was not unprofitable in 1915 and prior years under the rates which were unprofitable in the years 1916, 1917 and 1918, during which years there was a loss owing to the great increase in the cost of fuel, labor and material, and there is no evidence showing that the business on a normal basis is not feasible or practicable, something may be lawfully allowed for going value, in an attempt by the Public Service Commission to apportion the valuation and operating expenses for the purpose of determining proper rates for steam heat and electricity.

5. ———: ———: **Depreciation.** In view of the evidence in this case, it cannot be ruled that the Public Service Commission, in determining the value of the joint electric and steam-heating plant,

failed to consider depreciation. Its valuation being presumably valid and proper, and the record showing much evidence on the point which could have been lawfully taken into consideration and if so taken would have justified its valuation, it cannot be ruled that it is clearly or satisfactorily established that its valuation was either unlawful or unreasonable.

6. ———: **Apportioning Value and Operating Expenses to Different Services: Rule.** There can be no fixed and rigid rule for determining the proportion of value and operating expenses of a joint steam-heating and electric-lighting plant that should be borne by the two different public services. The problem in all such cases is to determine what portion of the entire property is used and is useful in each particular service. In this case, in which the Public Service Commission apportioned to the steam-heating business eighty-five per cent and to the electric-lighting business fifteen per cent, and the evidence shows that the joint plant is primarily and principally a heating plant and little used and but little useful for the production of electricity, and' that the commission followed the rule of assigning to each business that portion of the total value of the properties that will correspond to the extent of its employment in that business, its allocation is not disturbed.

7. ———: ———: ———: **Each Case Determined by Its Own Facts.** In determining the proper apportionment of expense of steam-heating production in a combined plant serving electricity and heat to consumers, no hard-and-fast rule can be adopted, but the apportionment in each case must be determined upon its own facts and circumstances, which are usually widely variant from those of other causes. A fifty-fifty allocation in one case may not be fair in another.

8. ———: ———: **Rates Higher Than Their Value.** About two hundred and fifty consumers obtained heat for their buildings from the company's down-town plant installed to furnish both electric-lighting and steam-heat service; all the buildings were equipped with their own house-piping and radiators suitable for steam-heating; a minority of them were without furnaces and boilers, but a majority had their own boilers and furnaces and could be heated by simply starting the fires, and hence as to them the value of the steam-heating service and the reasonableness of the rates were determinable by competition in the hands of the consumers; the Public Service Commission, in view of this competitive element, fixed rates which would enable the company to earn 2.92 per cent on their investment, and it retained jurisdiction in order that it might ultimately fix different rates if an actual test by operation showed that the rates were too high or unfair; several

large buildings supplied themselves with heat at less rates, but as to them there was no investment in a large and expensive distributing system and other important factors, such as the value of the portions of the buildings and grounds occupied by their plants and the element of greater cleanliness and convenience, were not included in estimating the cost of production of heat. *Held, first,* that the case is exceptional in that the rates are subject to competition in the hands of consumers, and, *second,* the facts do not clearly show that the rates fixed by the commission were unreasonable and higher than the service is worth.

9. ———: ———: ———: **Rates Subject to Change: Tested by Experience.** There is no better method to determine the reasonableness of rates, to be charged by a public utility to consumers, fixed by the Public Service Commission, which depend for their fairness upon many and variant contingencies, than a test by actual experience after they are in operation; and an order of the commission fixing tentative rates, which is not final and which reserves the right to modify the rates at any time, upon its own motion or upon the complaint of either consumers or the company, cannot be said to be an unreasonable order or to establish unreasonable rates.

Appeal from Jackson Circuit Court.—*Hon. Willard P. Hall,* Judge.

REVERSED.

*L. H. Bruer* and *James D. Lindsay* for Public Service Commission; *John H. Lucas, William C. Lucas* and *Ludwick Graves* for other appellants.

(1)   The court erred in holding that the rates and charges fixed by the commission for steam heat were unreasonable or unauthorized in that it did not specify separately the physical value of said property. The commission did find the value of the used and useful property for steam-heating purposes in full compliance with the law. State ex rel. S. W. Bell Telephone Co. v. Pub. Serv. Commission, 233 S. W. 430; Minn Rate Case, 230 U. S. 352, 57 L. Ed. 1511; Smyth v. Ames, 169 U. S. 465, 42 L. Ed. 819, 847. (2)   The court erred in holding that the commission did not by said order, or otherwise, make

298 Mo.—20

and file its findings of fact in writing upon all matters concerning which evidence was introduced before it, which constitute the elements bearing on the value of the property as required by the Public Service Commission Act. It did so find, voluminous in detail. (3) The court erred in holding that the Commission made an erroneous allocation as between electric service and steam-heating service of the property constituting the joint plant at Thirteenth Street and Baltimore Avenue. It did not make an erroneous allocation and the finding is without support in evidence or law. State ex rel. S. W. Bell Telephone Co. v. Publ. Serv. Commission, 533 S. W. 430; Minn. Rate Case, 230 U. S. 352, 57 L. Ed. 1511; Smyth v. Ames, 169 U. S. 465, 42 L. Ed. 819, 847; Decatur Railway & Light Co., P. U. R. 1920B, 711, 717; Northern Pac. Railway Co. v. North Dakota, 236 U. S. 555, 59 L. Ed. 735; Potomac Elec. P. Co. v. Pub. Util. Com. P. U. R. 1920C, 331; Interstate Commerce Com. v. Union P. Railway Co., 222 U. S. 541; In re Southern Ill. Light & Power Co., P. U. R. 1921A, 240; In re Central Ill. Light Co., P. U. R. 1921A, 545; In re Public Service Com., P. U. R. 1921B; 438; In re Virginia Ry. & Power Co., P. U. R. 1921C, 193. (4) The court erred in holding that the commission made an erroneous allocation of operating expenses, as between electric service and heating service at the joint plant at Thirteenth Street and Baltimore Avenue. It did not make an erroneous allocation of operating expenses. Cases cited above. (5) The court erred in holding that the commission fixed maximum rates for heating service which were and are unjust, unreasonable and excessive. There is no such charge in the motion for a rehearing, nor is there evidence to support same in the record. See cases supra; State ex rel. City of Hannibal, 236 S. W. 858; State ex rel. Wabash v. Pub. Serv. Com., 271 Mo. 155; Missouri, Kansas & Texas Ry. v. Pub. Serv. Com., 277 Mo. 192; State ex rel. Ozark Power & Water Co. v. Pub. Serv. Com., 287 Mo. 522, 532; St. Joseph Ry. Light, Heat & Power Co., 11 P. S. C. Mo. 109. (6) The court erred

in holding that not more than fifty per cent of the value of the steam-heating plant at Thirteenth Street and Baltimore Avenue should be allocated to steam-heating service. It is not for the court to determine a question of fact as to valuation. Cases cited above.

*Scarritt, Jones, Seddon & North.* and *Lathrop, Morrow, Fox & Moore* for respondents.

(1) In so far as the determination of questions of fact was involved in the writ of review, the trial court acted as a court of equity and was not bound in any way by the findings of the commission. C. B. & Q. Railroad Co. v. Pub. Serv. Commission, 226 Mo. 333; Lusk v. Atkinson, 268 Mo. 116; State ex rel. Light & Power Co. v. Publ. Serv. Comm., 272 Mo. 645; State ex rel. M. K. & T. Ry. Co. v. Public Service Com., 277 Mo. 193; State ex rel. Ozark Power & Light Co. v. Pub. Serv. Comm., 287 Mo. 531; State ex rel. St. L. S. F. Ry. Co. v. Public Service Comm., 242 S. W. 938. (2) The Commission's order violates the plain mandate of the Public Service Commission Act. (a) The commission has not made findings of fact upon all matters having a bearing upon the value of the property. Knoxville v. Water Co., 212 U. S. 1; Galveston Electric Co. v. City of Galveston, 42 Sup. Ct. Rep. 351; Home Telehone Co. v. Carthage, 235 Mo. 644; Springfield Gas & Electric Co. v. Barker, 231 Fed. 331; State Public Service Commission v. Springfield Co., 291 Ill. 209; Public Utilities Commission v. Wichita R. & Light Co., 268 Fed. 37; Muskogee Gas & Elec. Co. v. State, 186 Pac. 734; Contra Costa Water Co. v. City of Oakland, 159 Cal. 323; Puget Sound Electric Ry. v. Railroad Commission, 65 Wash. 75; Cumberland Tel. Co. v. Louisville, 187 Fed. 637; Cedar Rapids Gas Light Co. v. Cedar Rapids, 144 Iowa, 426; Marshall v. St. Joseph Gas Co., 3 Mo. P. S. C. 415;. In re Kansas City Elec. Light Co., 5 Mo. P. S. C. 111 to 118. The valuation is necessarily excessive. Home Telephone Co. v. Carthage, 235 Mo. 644; Marshall v. St. Joseph Gas

Co., 3 Mo. P. S. C., 403.  The commission has failed to "ascertain the value of the property."  Havre De Grace and Perryville Bridge Co. v. Towers, 103 Atl. 319; State ex rel. Building Co. v. Savage, 65 Nebr. 714; State ex rel. Oregon Co. v. Clausen, 116 Pac. 11.  (3)  The trial court rightly held that the commission improperly allocated both the property valuation and operating expenses as between the electric service and the heating service. Thayer v. Water Co., P. U. R. 1916 E, 962; LaJunta v. Arkansas Valley Co., P. U. R. 1916 D, 1076; Lincoln v. Water & Light Co., P. U. R. 1917 B, 59; Peck v. Indianapolis Lt. & Power Co., P. U. R. 1916 B, 445; Kennedy v. Electric Company, P. U. R. 1917 E, 288; In Re Lockport Light, Heat & Power Co., P. U. R. 1918 C, 675; Re Mineral Point Public Service Company, P. U. R. 1919 A, 795; Re Wisconsin-Minnesota Light & Power Co., P. U. R. 1919 B, 318; In Re Wisconsin Power, Light & Heat Co., P. U. R. 1918 B, 47; Lamar v. Intermountain Railway, Light & Power Co., P. U. R. 1918 B, 86, 110; In Re Decatur Railway & Light Co., P. U. R. 1920 B, 705; In Re Springfield Gas & Electric Co., P. U. R. 1920 A, 446; Re Central Illinois Light Co., P. U. R. 1921 A, 545; In Re Merchants Heat & Light Company, P. U. R. 1919 F, 558; In Re Northern Indiana Gas & Electric Co., P. U. R. 1919 F, 567; Fargo v. Union Light, Heat & Power Co., P. U. R. 1920 A, 764.  (4)  The order fixing heating rates is unlawful because the commission ignored and violated the legal principle that rates must not exceed the value of the service to the consumer.  Lusk v. Atkinson, 268 Mo. 109, 117; State ex rel. Watts v. Public Service Commission, 269 Mo. 525; State ex rel. Telephone Co. v. Public Service Commission, 233 S. W. 425; Smythe v. Ames, 169 U. S. 466, 547; Turnpike Co. v. Sandford, 164 U. S. 596; Railroad v. Minnesota, 186 U. S. 257; M. K. & T. Railroad v. Interstate Commerce Commission, 164 Fed. 645; Puget Sound Elec. Co. v. Railroad Commission, 65 Wash. 87; Kennebeck Water District v. Waterville, 97 Me. 185; Brunswick Water District v. Water Co., 99 Me. 371; Salt River Canal Co.

v. Nelssen, 85 Pac. 119; Re Richmond Light Co., P. U. R. 1917 B, 300; Murchie v. St. Croix, P. U. R. 1917 B, 384; Re Heisen, P. U. R. 1917 B, 644; Bogart v. Wisconsin Telephone Co., P. U. R. 1916 C, 1020; In Re Bridgeport Gas & Oil Co., P. U. R. 1916 C, 253.

SMALL, C.—This is an appeal from the Circuit Court of Jackson County. The proceeding in the lower court was to review an order of the Public Utilities Commission, fixing the rates which the Kansas City Light & Power Company might charge its consumers for steam-heating service.

The petition for review was filed by Mrs. Mary B. Case and about 70 other heat-consumers, including the city of Kansas City.

The order of the commission was set aside, and the Light & Power Company duly appealed from the action of the circuit court. The order so set aside was dated September 27, 1919. It also fixed rates for electricity, as well as steam-heat, furnished by said Light & Power Company, but the electrical rates were not complained of, nor brought before said circuit court for review.

The Kansas City Light & Power Company not only supplies electricity to Kansas City and its inhabitants, but also furnishes steam heat to a small area in the business district of said city. The steam for heating purposes was furnished from four plants, three small ones located respectively at Eighth and Walnut and Ninth and Walnut streets and at 1023 Grand Avenue. These small plants were exclusively heating plants and supplied about one-third of the steam-heat furnished by the company. The other, or large plant, was at Thirteenth and Baltimore Avenue. It was a joint steam-heat and electric plant, and from it was supplied about two-thirds of the steam heat furnished customers by the company. At said joint plant the steam from the boilers was first passed through engines or "prime movers" to generate electricity, and after it was used for that purpose—that is—the exhaust steam was allowed to flow

into the pipes of the heating system and was used for heating purposes. But no electricity, or substantially none, was made unless there was at the same time demand and use for all the exhaust steam in the heating service.

The commission in apportioning the valuation and operating expenses of the property in this joint plant for determining rates for steam heat and electricity, allocated eighty-five per cent as properly chargeable to steam heat, and fifteen per cent to electricity. This apportionment was in substantial accord with the undisputed evidence as to the units in the steam used for each service, a little less than fifteen per cent of the heat units in all the steam produced by the joint plant being used in making electricity, and a little more than eighty-five per cent for heating.

The grounds upon which the lower court set aside the commission's order, were: That the valuation and expense of the joint plant should have been apportioned equally to the electrical service and the heating service, that is, fifty per cent allocated to each service; also, that the finding of the commission of the value of the property was in a lump sum, and did not separately state the items of value and the amounts thereof considered by the commission in arriving at its total valuation, and that the heating rates fixed were unjust and excessive.

As their general contention in this court, respondents state in their brief: "We wish to emphasize here that we did not question before Judge Hall, nor are we questioning here, the figures found by the commission as to the physical value of the different units of the property, nor the figures found by the commission as to the investment of the company in the different units of the property. What we do question is the form of the order made by the commission (which does not comply with the statute), and the principles applied by the commission in determining the valuation of the property, and the allocation of the joint property and of operating expenses as between the two services. We also assert that

the commission has ignored the value of the service to the consumer.''

*The Light & Power Company's evidence as to the joint plant*:

As to the use and character of the joint plant, A. E. Bettis, superintendent of the Light Company, testified, in substance: ''It was constructed for the purpose of supplying heat to the downtown districts to the possible limits of conveying heat. It was not constructed as an adjacent, auxiliary to the furnishing of electricity. It was constructed, primarily, for the purpose of furnishing heat, in 1907. It isn't considered economical to transmit heat at the pressures that you transmit it on a low-pressure system much over four or five thousand feet. It covers an area less than a mile. When the Baltimore Avenue plant was constructed, there was no electrical apparatus in the building whatever, and no space to put in any. It consisted of the regular mechanical apparatus that goes with an ordinary heating plant. We had practically no heating business below Twelfth Street. In 1911 a new addition was made to the plant, fifty per cent increase. Another increase was made in 1912, and also in 1916. . . . The combination plant was a benefit to the steam users, but not to the electrical consumers, because it wasn't for the electrical business. We would never put [electrical] machines in that location.''

H. G. Blackwell, secretary of the Light Company, testified, in substance: ''All the steam we generated at that plant is passed through the electrical generators, and is delivered to the lower pressure heating system through the mains. There is produced from these generating engines a certain amount of electrical energy, dependent upon the amount of steam that goes out to the consumers. If the consumers demand a large quantity of steam, such as today, that will, as a result, produce comparatively a large amount of electricity. But, if it

is upon a fairly warm day, the steam that goes out to the consumers will produce through the generators a correspondingly small amount of electricity. These units were put in there to replace the old machinery; were specially built units, not economical in any sense, but were designed to operate on a certain amount of steam per kilowatt hour, primarily to act as reducing valves to reduce the high pressure to a relatively low distribution pressure.''

Mr. Porter, president of the Light Company, testified: ''We were going to use the exhaust steam to furnish heat as a by-product to electric lighting. Well, it turned out that there was nothing to it, that we didn't gain anything by that particularly, and following along that idea the General Electric Company developed these turbines in order to furnish exhaust steam, and at the same time make a certain amount of electricity in conjunction with this class of plant. The economy of those engines was so low that they better not have been installed, and as a consequence, when you come to start your engine to get any service out of the plant, it is regulated—that is, the use of the engine is ordinarily regulated by the amount of steam that you require. On an extreme cold day, they might be able to furnish a certain amount of electricity, but on the ordinary day, you can't start to make it. It costs you too much to make it.

''Q. In other words, you mean you don't always operate that plant to capacity all the time? A. You can't do it, because you can't use the steam. You can't afford to use the units because it would cost you about fifteen cents a kilowatt for current to run them, ten or fifteen cents. It would be out of reason.

''Q. You are paying today, aren't you, two and a half cents for current that you buy from the Long Building and the Bryant Building? A. Yes, sir, a few of those small buildings.''

Speaking in view of the actual operation and results,

Mr. Porter said the electricity produced at the joint plant was considered the by-product.

In view of the actual heat units in the steam used for each purpose, the engineer of the commission testified that the proper allocation of the values and operating expense of the property devoted to the joint use for rate-making should also be the same ratio, to-wit: thirteen per cent to the electrical service, and eighty-seven per cent to heating.

*Respondents' evidence as to joint plant:*

Mr. Baldwin, the expert engineer for the respondents, as to the proper ratio of apportionment, said: "I made my division somewhat as is usually done in dividing a property by taking the maximum demand as the basis. The maximum demand is usually used to divide the property value—the amount of money that it takes to put into a property determined by the maximum demand required. The use of that property is used as the usual thing to divide the operating expenses, very similar to dividing a water-works property. If you took a water-works property and tried to divide the fire services and domestic services by means of the use of the property you would get almost no part of it chargeable to fire services; and I know that the commission is familiar with the fact that a big part of the investment is due entirely to fire service. I have applied that method to this property. The generating equipment at that plant would require certain boiler capacity. The facts are that the intentions should be to put in enough generating capacity to use all of the boiler capacity, so that all of the steam could be used through the prime movers that drive the generators. This is the most economical way in which to operate that plant, and the several witnesses have so testified already. If that is true, then the boiler capacity should be probably divided fifty per cent between each service, if they are of equal importance. The commission's engineers have charged only eight and six-tenths per cent (no, thir-

teen per cent it worked out) of the investment to the electric service. I go to about fifty. I simply applied the fifty per cent, instead of the per centage used by the commission's engineers, and have arrived at a different figure naturally. There is also another basis that might be used, which was used formerly and that was the gross revenue basis, which would give approximately forty-seven per cent to heat and fifty-three per cent to light, very close to this fifty per cent division.''

Respondents also read in evidence the testimony of Mr. Kealy, former president of the Light Company, in a case before the commission in the year 1915, as to the relationship between the heat and light service. His testimony was as follows:

''Q. What relationship, Mr. Kealy, in your judgment, does the heating plant bear, or ought to bear, to the electric lighting plant in Kansas City? A. It is an absolutely essential adjunct, just as much so as the appliance department of the Light Company. The appliance department sometimes make a profit, but generally has a loss, but the theory on which appliances are sold is that they promote the use of electricity. Now some of the very largest electric light consumers that we have and customers through whose load factor the whole cost of producing and selling electricity is lowered, have only been possible to secure, owing to the steam-heating company. I refer to the fact that we have all the large hotels in the down-town district. They have shut up their boiler plants. The Baltimore, the Coates House, the New Muehlebach, several others, the Sexton. They are all buying electricity and would only have done that provided we could furnish them live steam for heating.

''Q. In other words, they would have provided their own plants unless you could have furnished them both electricity and heating. A. Not only that, but three of them already had their own plant, but dismantled them.

''Q. So you say to the commission, that the heat-

ing plant is a favorable adjunct to the lighting plant?
A. Not only that, but I have a list here. I didn't come
prepared to go into this, Judge, I will be glad to submit
to the commission later—of customers who have been se-
cured solely because we were able to serve them live
steam for heating, and although the customers are few
in number, the amount of power they require, the amount
of electricity they require, well, I think, it is over twenty-
five per cent of our total business. There is another mis-
take. The impression that might prevail from what
somebody said this morning, that the heating company
had been losing money. Year before last, two years ago,
they put in a turbine in the heating plant, with approxi-
mately 3,000 kilowats capacity, and that turbine, the
energy generated by that turbine, is being utilized by
the Light Company, and by the Light Company paying
a fair price for that energy the Heating Company be-
comes more than self-supporting, so that we find this
past year that the heating company, over and above all
operating expenses and taxes, has a surplus of about
$113,000, I think it is.

"Q. Then, it is not a burden but a benefit to the
Light Company? A. It is absolutely a benefit to the
Light Company. I think the engineers of the commission
found that roughly seventy per cent—sixty per cent of
the investment, in what is known as the Heating Com-
pany, had no relation to heating whatever, but was solely
used in manufacturing electric energy. [In the case be-
fore us the commission charged all property solely used
for electricity to the electric service.] . . .

"Q. You say the Heating Company have been pay-
ing expenses in the last two years; it has been doing
that by charging a cent and a-half for its electricity,
hasn't it? A. That is right, yes, sir."

The commission in its order in the case before us,
referring to Mr. Kealy's testimony in the former case,
says: "It appears from the foregoing, that the heating
business is conducted as a necessary adjunct to the elec-
tric business, and as so conducted was a source of profit

316 SUPREME COURT OF MISSOURI.

State ex rel. Case v. Public Serv. Comm.

to the defendant under the old rates for the year 1915, upon the basis of crediting to income from heating, the sums indicated in Table No. 1, for electricity generated at the Baltimore Avenue plant.''

The proceeding of 1915 in which Mr. Kealy testified, rates for electricity were alone involved. In March, 1917, the commission handed down its decision in that case, fixing the rates for electricity for the future and fixing the valuation upon the company's property as a whole. [In re K. C. Electric Light Co., 5 Mo. P. S. C. 20.] The steam heat rates were not under investigation and were not changed. Mr. Kealy's testimony was offered by the Light Company in that case to show that the steam-heating plant was not a burden on the Light Company under the conditions then existing. The commission in its decision in that case considered this testimony in that view.

In June, 1917, the appellant in this case, Kansas City Light & Power Company, filed a new tariff covering steam-heat rates to take effect August 1, 1917. Shortly afterwards, the respondents in this case intervened before the commission to question the reasonableness of the rate set out in the new tariff filed by the company. Upon a full hearing of the parties, the commission made an order in February, 1918, holding the new tariff filed by the company unreasonably high, but establishing maximum rates, higher than the rates in effect before the filing of the new tariff. Neither the Light Company, nor the consumers, asked for a review of this order. But in May, 1918, the Light Company filed new tariffs, which were suspended by the commission pending hearing, and in June, 1918, a formal application to the commission was made by it for an increase in rate both for electric current and steam heat.

After a full hearing, at different times, the commission decided the case on September 27, 1919, two of the commissioners dissenting. This is the proceeding now before us for consideration.

As to the valuation and apportionment of the value

and expense of the joint plant, the commission in the order assailed, says: "With reference to apportionment of property in joint use, commission's engineers state: 'The boiler plants at 1308 Baltimore and Wyandotte generate steam which is used for steam-heating and for the generation of electric energy. In general, the prime movers are only operated when there is sufficient demand for heating service to consume all steam exhausted into the heating system. When the demand is less, it is supplied with live steam direct from boilers to heating header. The prime movers exhaust into the atmosphere only in case of an emergency. Now all of the exhaust being used for heating purposes, the heat chargeable to electric service is properly the difference between the amount of heat supplied to the prime movers and the amount rejected by the prime movers and thence supplied to the heating system. Attention is directed to the fact that the electrical output at the Baltimore and Wyandotte station is a by-product. This condition is not assumed; it is a fact, and the apportionment of joint property is based upon this fact.' The final result is that $123,905, or fifteen per cent, is apportioned to the electric department, out of a total joint property of $823,725. These figures are exclusive of engines, generators, switch-board and wiring, which are obviously chargeable all to the electric department. . . . The actual conditions of use should be the basis for dividing joint property between the electrical department and the heating department. Actual operating conditions were used by the commission engineers, as a basis for making their apportionment. The method of apportionment used by the commission engineers is advocated by Gebhart 'Steam Power Plant Engineering' (4 Ed.) page 336 [Should be paragraph 186, page 327], where the author states: 'Most of the heat supplied to the engine is rejected through the exhaust; this varies from sixty-five per cent in the best of engines to ninety-five per cent in the poorer types. If all of the exhaust is used for heating or manufacturing purposes, the heat

chargeable to power is the difference between the heat supplied and that rejected.' This property being actually used for the generation and transformation of heat and for the housing of the apparatus used for the generation and transformation of the heat, the commission engineers assumed that it was logical to apportion the property used jointly in rendering service to the electrical and to the heating department on the basis of the amount of heat used by each to the total amount of heat generated. . . . However, we believe all of these results (that is, actual measurements and tests, as to the amount of heat used by each service, one of which showed eighty-seven and one-half per cent for heating and twelve and one-half per cent for electricity, and the other eighty-nine and two-tenths per cent for heating and ten and eight-tenths per cent for light) show that an apportionment of eighty-five per cent of joint property to heating is fair and equitable under the peculiar conditions under consideration. This apportionment in no way constitutes a precedent for other cases, where conditions might be materially different. . . . The company states that it is interested only in making an equitable decision between the customers of the steam department and the customers of the electrical department; that is, has endeavored to equitably distribute its charges between the users of steam and the users of electricity; that if these rates are diminished as to either, the rates must be correspondingly increased as to the other. . . . It appears upon full consideration of all the evidence in this case that the fair present value of the company's property (exclusive of the property of the Standard Electric Light Company) used and useful in rendering service to the public as at August 31, 1918, considering said property as a going concern, and including all overhead charges and all other elements of value, tangible and intangible, is $9,300,000, of which $8,000,000 is the value of the electric department, and $1,300,000 is the value of the heating department. . . . The heating department failed to make operating expenses by $222,-

558.84 in 1917, by $198,186.88 during the first eight months of 1918, by $98,507.98 during the last four months of 1918; and by $296,694.87 during the calendar year of 1918.  Attention is further directed to the fact that during none of these periods were the heating revenues sufficient to even meet the fuel expense alone. . . . The tremendous slump in the earnings in 1918, as compared with those in 1917, is due to the increased costs of fuel, labor and materials. . . . Table V. which follows, shows the basis of the calculation of the amount of revenue necessary to pay operating expenses, including depreciation, and seven per cent on $1,437,816.  This figure consists of $1,300,000, the fair present value fixed as at August 31, 1918, plus additions to the amount of $137,816.00 reported by the company to December 31, 1918. . . . Heretofore, the steam-heating business has been carried at a loss, and this loss has been borne either by the light and power consumers or by the company.  This is a distinctly inequitable condition which must be eliminated as soon as possible.  As just stated, the heating department revenue necessary to operating expenses, including depreciation and seven per cent on $1,437,816, is $693,465.93.  It would take a theoretical increase in heating rates of more than one hundred per cent to certain classes of consumers to produce this revenue; but as a practical matter, it appears that such a single large increase would result in a loss of customers, and consequently would not produce the necessary revenue. The commission is therefore of the opinion that it is advisable to adopt the following heating schedules at this time. . . . It is estimated that the total heating revenue produced by the above schedules will amount to approximately $635,000 per annum, and will leave available for return the difference between this amount and $593,000 (expenses), or $42,000, which is equivalent to a return of 2.92 per cent on $1,437,816."

I. *Not necessary to itemize or state "going value" separately in order of the commission:*

320 SUPREME COURT OF MISSOURI.

State ex rel. Case v. Public Serv. Comm.

Section 78 of Public Service Commission Law, 1913, being Section 10487, Revised Statutes 1919, provides as follows:

"1. The commission shall have the power to ascertain the value of the property of every gas corporation,

**Going Value.** electrical corporation and water corporation in this State and every fact which in its judgment may or does have any bearing on such value. . . . 2. The commission shall make and file its findings of fact in writing upon all matters concerning which evidence shall have been introduced before it, which in its judgment have bearing on the value of the property of the gas corporation, etc., affected."

The respondents contend that the finding of the commission in this case is void because it did not separately state the amount it allowed for the "going concern" or "intangible value," which its finding shows it considered in fixing the value of the property. In the first place, we do not think that the "going concern" or "intangible value" of a plant of this character could be accurately separated and stated by itself apart from the physical value of the property. In passing upon this point in Appleton Water Works Co. v. Railroad Commission, 154 Wis. l. c. 148, that court said: "The fundamental difficulty with the attempt to set a definite sum as the measure of going value is that it is an attempt to divide a thing which is in its nature practically indivisible. The value of the plant and business is an indivisible gross amount. It is not obtained by adding up a number of separate items, but by taking a comprehensive view of each and all of the elements of property, tangible and intangible, including property rights, and considering them all, not as separate things, but as inseparable parts of one harmonious entity."

The form of finding, complained of in this case, has long been followed by our Public Utilities Commission, and is based upon the foregoing ruling by the Supreme Court of Wisconsin. [In re Mo. So. Ry. Co., 3 Mo. P. S. C. l. c. 40; In re Citizens Gas Co., 12 Mo. P. S. C. 221.]

Furthermore, there was no evidence before the commission as to the "going concern" or "intangible value" of the plant, considered separately from the physical value of the plant and consequently the statute cited which only requires findings of fact upon all matters concerning which evidence shall have been introduced before it would not apply to "going concern" or intangible value in this case. The act must be liberally construed to the end that the orders of the commission may not be avoided.

Section 127 of the Public Service Commission Act, Laws 1913 (R. S. 1919, sec. 10538), provides: "A substantial compliance with the requirements of this Act shall be sufficient to give effect to all the rules, orders, acts and regulations of the commission and they shall not be declared inoperative, illegal or void for any omission of a technical nature in respect thereto. The provisions of this act shall be liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities."

II. *Trial in this court is de novo*:

Moreover, it is agreed by both parties to this controversy, and it is well established law, that the proceeding in the circuit court and in this court on appeal to review an order of the Public Utilities Commission, is under the provisions of the Utilities Act, an equitable proceedings, and not a proceeding at law, and, therefore, is triable *de novo* in this court. Hence, this court would not be bound by the findings of fact, had they been separately made by the Public Utilities Commission, as in equity proceedings, this court is not bound by the findings of fact, either general or special, of the chancellor below. [Railroad v. Pub. Service Comm., 266 Mo. 333; Lusk v. Atkinson, 268 Mo. 116; State ex rel. Ry. Co. v. Pub. Service Comm., 272 Mo. 645; State ex rel. Power Co. v. Pub. Service Comm., 287 Mo. 522; State ex rel. Ry. Co. v. Public Service Comm., 242 S. W. 938.]

298 Mo.—21

The decision of the Supreme Court of Illinois in Public Service Commission v. Springfield Gas Co., 291 Ill. 209, and other cases cited by respondents holding that separate findings of fact as to elements of value allowed by the commission should be made, otherwise the finding of the commission should be considered void and the cause remanded for re-hearing, are not in point, because, under the statute of those states the proceedings before the commission were at law and were not triable *de novo* on appeal or review, as in an equity case, as in this State.

III.  *The burden of proof is upon respondents*:

Section 10534, Revised Statutes 1919, provides: "All rates  .  .  .  fixed by the commission  .  .  .  shall be prima-facie lawful."  Section 10535 provides:  "In all trials, actions, suits and proceedings arising under the provisions of this chapter or growing out of the exercise of the authority and powers granted herein to the commission, the burden of proof shall be upon the party adverse to such commission  .  .  .  to show by clear and satisfactory evidence that the  .  .  .  order of the commission complained of is unreasonable or unlawful as the case may be."

We have, therefore, in Division as in Banc, construed and enforced these statutory provisions and required the party attacking an order of the commission fixing rates to bear the burden of proof and to show by clear and satisfactory evidence that the rates attacked were unreasonable or unlawful as might be contended. [State ex rel. Harrisonville v. Pub. Service Comm., 236 S. W. 852;  State ex rel. Tel. Co. v. Pub. Service Comm., 233 S. W. 425, l. c. 430 et seq.]  The same doctrine was announced in State ex rel. Wabash Ry. Co. v. Pub. Service Comm., 271 Mo. l. c. 159.

IV. *"Going Value" was allowable*:

The respondents claim that no "going value" in addition to the "physical" or "bare-bones" value of the heating plant could be allowed by the commission lawfully, because the evidence showed that for two or three years before the company's business had been a losing or unprofitable one, and cite the following authority in support of the proposition: Marshall v. Gas. Co., 3 Mo. P. S. C. l. c. 415. In that case, the company distributed natural gas, and its business had been unsuccessful each year for the prior ten years. The commission held that, therefore, it had no value as a "going concern." Here, it is not shown the business had been unprofitable up to 1915, under the same rates which were unprofitable in 1916, 1917 and 1918. The business was conducted at a loss in those years on account of the great increase in "the cost of fuel, labor and materials," as found by the commission and shown by the evidence. The evidence did not show that the business on a normal basis was not a feasible or practicable business, or that the demand for heat, in the business district of Kansas City had fallen off, or in any manner decreased. We think, therefore, in this case, something could have lawfully been allowed for "going value." It falls within the general rule on that subject.

In Des Moines Gas Co. v. Des Moines, 238 U. S. l. c. 165, the Supreme Court of the United States said: "Going value or going-concern value, that is, the value which inheres in a plant where its business is established, as distinguished from one which has yet to establish its buiness, has been the subject of much discussion in rate-making cases before the courts and commissions. . . . That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return, when the same is privately owned, although dedicated to public

usc." To the same effect are: Denver v. Denver Union Water Co., 246 U. S. 178; Cedar Rapids Gas Co. v. Cedar Rapids, 223 U. S. 655; Omaha v. Omaha Water Co., 218 U. S. 180.

V. *The record does not show the commission failed to consider depreciation*:

Respondents claim that the commission in fixing the value of the heating plant at $1,300,000 on August 31, 1918, made no allowance for depreciation. This claim is based on the testimony of the commission's engineer. He testified that the reproduction value new on August 31, 1918, was $1,303,846. That he depreciated this valuation from 1914 until August 31, 1918, at three. and one-half per cent per annum, leaving a net value, less depreciation, of $994,875. The engineer, however, testified, that in his judgment it should not be depreciated that much, because for the preceding two or three years the rate had been such that the consumers had not paid to the company a reasonable return on its property. He further testified that his valuation was simply the physical value or "bare-bones" value without any consideration of intangible value (which would include going-concern value) which he said was for the commission to add if it determined to do so. In his valuation of the reprodution cost, the engineer included the value of the property on December 31, 1914, as previously determined by the commission engineers, which was $664,814, after allowing three and one-half per cent per annum for five years as depreciation. The evidence showed that the valuation on December 31, 1914, was made on the basis of the average cost of the materials constituting the property during the previous five years. Mr. Morrow, the assistant engineer, who testified to the valuation of December 31, 1914, also testified that the condition of the property at the time of the trial was ninety per cent par. The company's president, Mr. Porter, testified that the value of the property on December 31, 1918, was $1,712,971.00 on the then basis of values. Another witness for the

company testified that the original cost was about $1,800,000, which he depreciated at three and one-half per cent per annum, and less the depreciation, which he allowed, he valued the property at $1,333,449. As we have seen, the statute makes the valuation of the commission prima-facie valid, reasonable and lawful, and casts the burden on respondents to show the contrary by "clear and satisfactory evidence" in the record. The presumption is, therefore, that the commission did allow a proper sum for depreciation. Its order shows that it considered all the evidence in the case in fixing the value.

If so, the commission could have figured the depreciation at the full sum estimated by its engineer, Mr. Harrop, and adopted the valuation of Mr. Porter, or adopted the valuation and depreciation of the plaintiffs' witness, Bettis, and still found the value of the property more than $1,300,000. Or, it could have allowed a reasonable sum for going value, and depreciated the property only ten per cent, as suggested would be proper by Mr. Morrow, or considered that the reproduction cost estimated by its engineers, one-half of which was based on the average prices for materials during five years preceding December 31, 1914, should be somewhat increased, on account of the well known fact that such materials were much more valuable in 1918 than before the war. The valuation of the commission being presumptively valid and proper, and the record showing facts which could have been lawfully considered and taken into the account to justify the valuation of the commission, there is no clear and satisfactory evidence that it was either illegal or unreasonable and it must be allowed to stand.

VI. *Not satisfactorily shown that Commission's allocation of joint plant was erroneous*:

We are not convinced that the commission adopted the wrong rule or ratio for determining the proportion of value and operating expenses of the joint plant which

should be borne by the heat and electrical services respectively. In such cases, there obviously could not be a fixed and rigid rule applicable to all cases, without reference to the particular circumstances. The problem in all cases is to determine what property or portion thereof, in case of property jointly used by two different public services, is used and useful in the particular service whose rates are the subject of inquiry. [Minnesota Rate Cases, 230 U. S. 352; Smyth v. Ames, 169 U. S. 1. c. 466-7.]

In the Minnesota Rate Case, 230 U. S. 1. c. 461, where a railroad was used for both state and interstate business, it was expressly held that the expense of operation and value of the property jointly used in order to ascertain a reasonable rate for state business, should not be divided in proportion to the gross receipts from state and interstate business—thus condemning the gross-income method of allocation suggested by the witness Baldwin, in this case, and which he said produced practically the same result as the fifty per cent division adopted by him. On the other hand, the court ruled the allocation of the value of the jointly used property should correspond to the extent of its use for each service. The court said, at page 461, Mr. Justice HUGHES rendering the opinion: "When rates are in controversy, it would seem to be necessary to find a basis for a division of the total value of the property independently of revenue, and this must be found in the use that is made of the property. That is, there should be assigned to each business, that proportion of the total value of the property which will correspond to the extent of its employment in that business."

In the case at bar, we think the division adopted by the commission follows the rule above announced by Mr. Justice HUGHES.

The evidence shows, that the plant at Thirteenth and Baltimore Avenue was originally built solely for the purpose of furnishing heat to the larger buildings in the business district of Kansas City, because the owners would not take electric light from the Light Company

unless they could also secure steam-heat. It made no electricity. The electric light which was furnished to the building was supplied by the Light Company from other sources than its heating plant for a number of years after the heating plant was established.

At the time the evidence in this case was heard, the Light Company had for a number of years purchased, roughly speaking, perhaps three-fourths of the electricity it supplied to its consumers from the Street Railway Company, which had a large electric generating plant on the banks of the Missouri River in the northern part of Kansas City. The other one-fourth was procured more than half from its Central Avenue electric plant located on the banks of the Kaw, and the balance mostly from the joint heating and electric plant in question at Thirteenth and Baltimore.

The evidence shows that some years before the trial the Thirteenth and Baltimore heating plant was enlarged and new boilers procured and electrical engines or prime movers were installed therein by which all the steam produced before being used for heating purposes would be used in such prime movers to produce electricity for lighting and power purposes. That the steam was not used for producing electricity unless the exhaust could at the same time be used for heating purposes, which could be done only in cold weather. That in ordinary weather there was not sufficient steam used for heating to generate electricity in substantial quantities. To use the plant for producing electricity alone, without at the same time using all exhaust steam for heating purposes, would make the electricity so produced cost from ten cents to fifteen cents per kilowatt. That this expense was prohibitive, because electric current could be purchased, and the most of its electricity was purchased, for less than two and one-half cents per kilowatt, and could be produced in an efficient electric plant properly located, for still less. So that the joint plant in question was, in fact, principally and primarily, a heating plant and but

little used or useful for the production of electricity, as compared with its use and usefulness for heating.

It is true, that there was evidence that the company at the time of the hearing had under construction a very large electrical plant in the east bottoms on the Missouri River, and that this might not probably be sufficiently completed for four or five years to care for the peak-load of electric energy required by the company at times in the winter season, and that to help care for such peak-load until the east bottoms plant was fully completed, the joint plant, at Thirteenth and Baltimore Avenue, might be used as a stand-by or emergency plant. But the expense of making electricity therein, as we have seen, would be so great as largely to neutralize its benefit as a stand-by or emergency plant.

Indeed, the evidence shows that the joint plant was a practical failure, considered as an electric plant to be operated for electricity only without using the exhaust steam for heating purposes. It was not a commercial possibility when so operated. It is located near the heart of the business district of Kansas City without switch facilities, on high-priced land and without a river nearby to furnish cheap and abundant water for condensing engines. The evidence shows, as stated by the commission, that at an exclusively electrical plant properly located and equipped, electricity could be produced with fifteen or twenty pounds of steam per kilowatt, whereas, it would require fifty pounds of steam per kilowatt at this joint plant.

The record shows that the rates for electricity were fixed by the commission at the same time the rates for heat were fixed, and on the same basis of allocation of said joint plant, that is, that only fifteen per cent of the value and expense of operating was charged to the electrical consumers or service. Any increased charge therefore to the electric service would result in increasing the rate to the electrical consumers. We think, it would not be just to require them to pay the increased rates made necessary by operating this inefficient and high-priced

joint plant for production of electricity, when the exhaust is not being used for steam-heating. The joint plant is located where it should be for the heating business near the business district, which it supplies with heat, because, the evidence shows, steam cannot be transported more than four or five thousand feet for heating purposes. Whereas, plants for the production of electricity as cheap and as economical as may be, to which the public and electric consumers are entitled, should be located, when they reasonably can be, as in Kansas City, upon a large stream and in the suburbs, on cheap land near the terminal railroad where they can have abundant switch facilities for obtaining their coal and supplies and abundant water for operating condensing engines.

As the record shows, at the time this case was being tried, the Light Company was preparing to meet this just demand of the public and electric consumers and had under construction a very large electric plant, located on about twenty-eight acres of land on the Missouri River in the east bottoms in Kansas City.

All the circumstances considered, we hold that the allocation complained of was as accurate, just and fair as reasonably possible or attainable. It should not be disturbed.

VII. *Rulings of other commissions in other cases not decisive*:

Respondents' learned counsel insist that the allocation complained of has no support in the rulings of other public utilities commissions, and that it is in direct conflict with the ruling of the New York Commission in the case of In re Lockport Light, Heat & Power Co., P. U. R. 1918 C, 675. It is true, in that case the commission rejected the theory of allocation adopted by our commission in the case at bar and ruled as a compromise of the different theories urged, that a fifty-fifty division would be proper, as adopted by the court below in this case. But, in that case there was another factor not in

this case, which the expert McClellan, whose theory the commission adopted, took into consideration. The Lockport Company purchased its electricity from a Niagara Falls electric company. The contract provided that the electricity might be taken off at 1:00 a. m. and 5:00 a. m., any day. So that it was necessary to have the joint plant in readiness to supply all of its customers in Lockport every day between those hours should the Niagara Company cut off electricity, as it had a right to do. On account of this fact, Mr. McClellan estimated that approximately thirty per cent of the total operating expenses should be charged to electricity and seventy per cent to steam heat. That if the plant was operated to carry the peak-load demanded for electricity, which he in another place in his report said it was difficult to determine would save the company money, forty per cent should be charged against the electric service for that purpose. Therefore he compromised by dividing the operating expenses equally between electric service and steam heat. McClellan also considered electricity the by-product if made only when all the exhaust steam was demanded for heating. (See pages 697 to 699, P. U. R. 1918 C).

In Re Pub. Service Comm. of Northern Illinois, P. U. R. 1921 B, 438, the commission held that two-thirds of the expense of operation of a joint hot-water and electric plant, where the exhaust steam was used to heat the water, was properly allocated to heating service and one-third to electricity.

In Re Central Ill. Light Co., P. U. R. 1921 A, 1. c. 550-1, the allocation of a joint steam-heating and electric plant was according to the maximum steam demand of the heat and electric utilities expressed in boiler power, with the result that forty-two per cent was charged to heat and fifty-eight per cent to electricity.

In Re Decatur Ry. & Light Co., P. U. R. 1920 B, 705, it was ruled that, in determining the proper apportionment of expense of steam-heat production in a combined plant serving electric and heat consumers, no hard-and-fast

rule could be adopted, but each case turns upon its own circumstances. To this ruling we agree.

A number of other commission cases are cited by respective counsel, but they are widely variant in their facts and afford no fixed rule or guide for us in this case. Our commission in its order and opinion herein carefully considered the rulings of other commissions above noted, and concluded they did not rule this case in the circumstances in this record. That the just and fair allocation was the ratio which they and their engineers adopted, which was supported by the text-book authority quoted in their opinion.

It is not shown, certainly not by "clear and satisfactory evidence," that the commission was in error. Therefore, we cannot disturb its determination.

VIII. *It is not shown that the order complained of established unreasonable or higher rates than their value to the consumers:*

Respondents strenuously contend that the rates allowed were unreasonable and greater than the service was worth to the heat consumers, and that a greater rate than that cannot be allowed, although the company would thereby be required to do business without any profit, or even at a loss.

The evidence shows that there were about two hundred and fifty heat-consumers. It is also to be gathered from the evidence that less than a majority of these consumers were without furnaces and boilers of their own, or would have to install furnaces or boilers in their buildings to supply themselves with heat. All of them were fully equipped with their own house-piping and radiators suitable for steam-heating. The evidence tends to show that the majority of the consumers also had their own furnaces and boilers and could heat their own buildings by simply starting their fires, if they preferred to do so, rather than pay the increased rate fixed by the commission. So that the value of the service to the consumer, as well as the reasonableness of such rates, were determinable by competition in the hands of the consumers

themselves. It was recognized by both the commission, in the order complained of and by Mr. Baldwin, respondents' expert, that the heating rates which the commission might fix would be subject to efficient and regulating competition by the heat consumers. Mr. Baldwin testified that the table of rates which he had fixed and which was offered in evidence and which was less than the rates which were ultimately adopted by the commission, were fixed by him on the assumption that the consumers would go back to using private plants, rather than pay a higher price than those contained in his schedule, and the utility would lose its business.

The commission, in view of this competitive element in the problem, fixed rates which would enable the company to secure but two and ninety-two hundredth per cent per annum on its investment—not one-half the profit ordinarily allowed to a public utility—because the commission considered that the heat consumers would not pay rates sufficient to yield the company the usual fair return, but would, as they could, withdraw their patronage and furnish their own heat, rather than pay a higher rate than that fixed in the order of the commission.

In view of the ability of the heat consumers them-. selves to thus regulate the rates they pay for the service they receive, which does not exist when the utility is a practical monopoly, such as a gas, electric, water, telegraph, telephone or railroad company, the reasonableness of the rates fixed can be most accurately and satisfactorily tested by permitting the rates fixed by the commission to remain in force for a reasonable time, so as to demonstrate whether the consumers would pay such rates or revert to the use of their own plants.

This case is exceptional in that the rates are subject to efficient competition in the hands of the consumers, the same as are the rates or price for any commodity where there is fair and efficient competition.

In this case, the commission by its order, provided as follows:

"*Ordered*: 6. That the Kansas City Light & Power Company shall keep true and correct records of its total

gross income and operating expenses of both the electric and heating departments and file quarterly reports with the commission, duly verified by its secretary, setting forth fully such income and operating expenses, and that said reports shall begin with the first day of November, 1919, and continue until otherwise ordered by the commission.

"*Ordered*: 7. That the commission fully retain jurisdiction of the parties and subject-matter of this cause upon the evidence before the commission, together with such other evidence as may be offered therein, for the purpose of making any modification of this order, or supplemental order herein, at any time it may deem just and proper."

By virtue of the above provisions, the commission of its own motion, or of any of the parties, could at any time after the rates complained of had been in actual operation, and tested by actual experience, have appeared before the commission for a modification thereof, if such experience should show they were unreasonable or higher than they were worth to the consumer. In effect, the rates were not finally fixed, but were test rates.

In the case of State ex rel. Watts Eng. Co. v. Pub. Service Comm., 269 Mo. l. c. 534-5-6, it was held that there was no better way to determine the reasonableness of rates fixed by the commission which depend on many and such varied contingencies, than by a test after they shall have been in operation, and that an order of the Public Utilities Commission which is not final and which reserves the right to modify it at any time, in case it should prove unreasonable, as in this case, could not be said to be an unreasonable order or to establish unreasonable rates. This doctrine should apply as well when the consumers attack the rate fixed by the commission, as when the public utilities company attacks it—especially, when the consumers are themselves in a position to compete with the utility, as here.

In this case, the rates established by the commission did not go into operation until the date of the final order

334    SUPREME COURT OF MISSOURI.

State ex rel. Case v. Public Serv. Comm.

establishing them, the rates previously established in February, 1918, having been by order of the commission continued in force until the order in question was made on September 27, 1919, and therefore the record does not and cannot show the result of their actual operation.

It is true, that there was evidence in this case tending to prove that several large buildings supplied themselves and their neighbors immediately adjoining them or just across the street, at substantially less rates than those fixed by the commission here. But in all such cases, important factors were left out of the problem. In all such cases, there was no investment in a large and expensive distributing system, and they made no allowance in any such cases for the value of the portion of the buildings and grounds such plants occupied, or any allowance for the greater convenience and cleanliness of taking heat from the company. Nor was there any allowance for the large loss by condensation, which the company sustained in carrying the steam through its much more extended distributing system, than was possessed by these private plants which supplied only themselves and one or two of their immediate or adjoining neighbors.

The burden of proof is, under the statute, upon the respondents to show by clear and satisfactory evidence that the order complained of established rates which were unreasonable, or were as provided therein higher than their value to the consumers. This respondents have failed to do, and we must rule this point against them.

The result is, that the judgment of the lower court is reversed, and the cause is remanded with directions to said court to render judgment herein for the defendants below and appellants here. *Brown* and *Lindsay, CC.*, not sitting.


PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. *Graves, P. J.*, and *Woodson, J.*, concur; *James T. Blair* and *Ragland, JJ.*, concur in result.