[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 449 
Charles F. Russell, doing business under the name of Russell Transfer and Storage, made application to the Board of Railroad Commissioners, under chapter 164, Laws 1933, for a Class "A" certificate of public convenience and necessity to operate motor trucks as a common carrier of property in intrastate service between the city of Minot and the city of Williston. Great Northern Railway Company and Interstate Transportation Company, both operating as common carriers of property between the city of Minot and city of Williston, appeared in opposition to the application. Hearing was had before the Board of Railroad Commissioners, at which considerable testimony was taken, and the Board of Railroad Commissioners entered an order granting the application. Great Northern Railway Company and Interstate Transportation Company appealed from the order of the Board of Railroad Commissioners to the district court of Williams county.
The whole record, including a transcript of all the evidence adduced upon the hearing before the Board of Railroad Commissioners, was certified to the district court. A trial was had in the district court upon the record so certified. The trial court reversed the order made by the *Page 450 
Board of Railroad Commissioners. The applicant, Charles F. Russell, has appealed to this court from the decision of the district court.
In 1933 the Legislative Assembly enacted a comprehensive statute "providing for the supervision and regulation of the transportation of persons and property for compensation over any public highway by motor-propelled vehicles." Laws 1933, chap. 164.
The statute provides:
"Section 2. (a) The term "common motor carrier of property," when used in this Act, shall mean any person who holds himself out to the public as willing to undertake for hire to transport by motor vehicle from place to place the property of others who may choose to employ him. (b) The term "common motor carrier of passengers," when used in this Act, shall mean any person who holds himself out to the public as willing to undertake for hire to transport by motor vehicle from place to place persons who may choose to employ him. (c) The transportation for more than one consignor, or to more than three consignees, by any motor carrier shall be prima facie evidence that such motor carrier is operating as a common carrier.
. . . . . . . . . . .
"Section 5. No common motor carrier of property or passengers shall operate any motor vehicle for the transportation of either persons or property for hire on any public highway in this state except in accordance with the provisions of this Act.
"Section 6. The commission is vested with power and authority, and it shall be its duty, to supervise and regulate all common motor carriers of property or passengers as defined in Section 2 and after a hearing thereon, to fix, alter, regulate and determine just, fair, reasonable and sufficient rates, fares, charges, and classifications; to regulate the facilities, accounts, service and safety of operations of each such carrier, to regulate operating and time schedules so as to meet the needs of any community, and so as to insure adequate transportation service to the territory traversed by such carriers, and so as to prevent substantial duplication of service between these common motor carriers, and between them and the lines of competing steam and electric railroads; and not to substantially substitute the operation of motor common carriers for existing steam or electric transportation facilities; . . . The commission shall have power and authority by general order or *Page 451 
otherwise, to prescribe rules and regulations in conformity with this Act applicable to any and all such common motor carriers, and to do all things necessary to carry out and enforce the provisions of this Act.
. . . . . . . . . . .
"Section 8. It shall be unlawful for any common motor carrier to operate within this state without first having obtained from the commission a certificate of public convenience and necessity. The commission, upon the filing of an application for such certificate, shall fix a time for hearing thereon, which shall be not less than twenty days after such filing. The commission shall cause notice of such hearing to be served by registered mail at least ten days before the hearing upon an officer, managing agent or owner of every railroad or other common carrier that is operating, or has applied for a certificate to operate in the territory proposed to be served by the applicant, and on other interested parties as determined by the commission, and any such common carrier or interested party is hereby declared to be an interested party to said proceedings and may offer testimony for or against the granting of such certificate. Any other interested person may offer testimony at such hearing. If the commission finds from the evidence that the public convenience and necessity require the proposed service or any part thereof it may issue the certificate as prayed for, or issue it for the partial exercise only of the privilege sought, and may attach to the exercise of the right granted by such certificate such terms and conditions as in its judgment the public convenience and necessity may require; otherwise such certificate shall be denied. Before granting a certificate to a common motor carrier, the commission shall take into consideration existing travel upon said route, the increased cost of maintaining the highway concerned, the effect on other essential forms of transportation, and existing transportation facilities in the territory for which a certificate is sought, and in case it appears from the evidence that the service furnished or that could be furnished by existing transportation facilities is reasonably adequate, the commission shall not grant such certificate.
. . . . . . . . . . .
"Section 29. In all respects in which the commission has power and authority under this Act, applications and complaints may be made and filed with it and notices issued thereon, hearing held, opinions and decisions *Page 452 
made and filed, petitions for rehearing filed and acted upon, and appeals from such orders and decisions may be taken by any party to the district court of the county where such hearing was held unless otherwise provided for in this Article, in the same manner and under the same terms and upon the same conditions provided for by §§ 4609c1 to 4609c56 inclusive, Supplement to the 1913 Compiled Laws of North Dakota, with the exception that the appellant shall be entitled, on demand, to a trial de novo in the district court."
Sections 4609c34 and 4609c35, Supplement to the 1913 Compiled Laws of North Dakota, provided:
"4609c34. Any party to any controversy heard by the commissioners feeling aggrieved by the decision or by the entry of any final order of the commissioners therein may appeal therefrom (to) the district court in the district in which the hearings of the commissioners were held in the matter, by serving notice in writing on all other parties to said controversy and on the commissioners within thirty days after the rendering of said decision and entry of the final order therein by the commissioners.
"4609c35. On such appeal the lawfulness of the decision or final order shall be inquired into and determined on the record of the commissioners as certified to by it. No new or additional evidence shall be taken on such appeal or introduced in evidence by any party to such hearing on appeal in the district court."
Pursuant to the provisions of said chapter 164, Laws 1933, as amended by chapter 182, Laws 1935, the Board of Railroad Commissioners has established, among others, two classes of motor carriers transporting property for compensation, to wit:
1. The Class "A" motor freight carrier who operates over a fixed route on schedule time, charging the classified rates fixed by the Commission.
2. "Special" motor carriers who operate at the will and command of the shipper as to time and destination, hauling in load lots of 8500 pounds or more, from one consignor at one point of origin to one consignee at one point of destination on one Bill of Lading; and in load lots from 5,000 pounds to 8,500 pounds, from one consignor at one point of origin to not more than three consignees at one destination.
The application involved in this proceeding is for a Class "A" *Page 453 
certificate, which will authorize the operator to haul freight between Minot and Williston on schedule time and at classified, or regular, rates.
It appears from the evidence that the applicant, Russell, already has an interstate license from the Interstate Commerce Commission, authorizing him to transport interstate shipments to the places in question. It further appears that he has a "Special" certificate, granted by the Board of Railroad Commissioners, authorizing him to haul load lots between Minot and Williston.
On this appeal, appellant asserts: 1. That the evidence adduced before the Board of Railroad Commissioners was sufficient to sustain their findings that public convenience and necessity required the services which the applicant proposed to furnish; and 2. That the Board of Railroad Commissioners has authority to prescribe rates, classifications, rules, and regulations only
pursuant to, and after, notice and hearing; that no action has been taken by the Board of Railroad Commissioners under chapter 164, Laws 1933, fixing the classification of carriers; that consequently appellant's application for a Class "A" certificate was unnecessary and the district court erred in reversing the order of the Board of Railroad Commissioners granting such certificate. These contentions will be considered in the order stated.
The Public Utility Act (chapter 192, Laws 1919, §§ 4609c1 to 4609c56, 1925 Supplement) makes provision for hearing after notice to the parties affected. State ex rel. Hughes v. Milhollan, 50 N.D. 184, 195 N.W. 292. It also makes provision for an appeal to the District Court from the decisions and orders of the Board of Railroad Commissioners (Laws 1919, chapter 192, § 34), and it provides that "on such appeal, the lawfulness of the decision or final order shall be inquired into and determined on the record of the Commissioners as certified to by it. No new or additional evidence shall be taken on such appeal, or introduced in evidence by any party to such hearing on appeal in the District Court" (Laws 1919, chapter 192, § 35).
It was the intention of the lawmakers as evidenced by the provisions of the Public Utility Act "that the orders of the commissioners must be based upon evidence submitted to them at the hearing or hearings; and that on appeal the validity and lawfulness of the orders must be determined by the evidence contained in the record certified to the court; and that in reviewing such orders the court must exercise its *Page 454 
own independent judgment upon such facts and the law applicable thereto." State ex rel. Hughes v. Milhollan, supra.
Chapter 164, Laws 1933, provides that appeals from the orders and decisions of the Board of Railroad Commissioners made under that Act, may be taken to the district court of the county where such hearing was held, unless otherwise provided, in the same manner and under the same terms and upon the same conditions as appeals may be taken from orders or decisions under the Public Utility Act "with the exception that the appellant shall be entitled, upon demand, to a trial de novo in the district court." Laws 1933, chapter 164, § 29.
It must be presumed that the lawmakers enacted chapter 164, Laws 1933, with knowledge of the then existing laws, including the construction that had been placed by this court upon the provisions in the Public Utility Act, relating to appeals. It is apparent therefore, that the lawmakers intended that on an appeal from an order or decision made by the Board of Railroad Commissioners in a proceeding before it, under chapter 164, Laws 1933, the district court should be vested with greater powers in reviewing and weighing the evidence than it had on appeals under the Public Utility Act, because they expressly provided that in addition to the functions performed by the district court on an appeal under the Public Utility Act, on an appeal under chapter 164, Laws 1933, the district court, on demand of the appellant, shall try the case de novo.
The provision that the district court, on demand, shall try the case de novo, speaks for itself. In order to try the case denovo, the district court must, of necessity, weigh the evidence and apply its independent judgment to such evidence and the questions to which it relates, and determine whether the order or decision appealed from is in accord with the weight of the evidence. Christianson v. Farmers' Warehouse Asso. 5 N.D. 438, 444, 67 N.W. 300, 32 L.R.A. 730.
Where witnesses have appeared and testified orally before the Board of Railroad Commissioners, the district court on appeal, will, of course, give due weight to the decision of the Board of Railroad Commissioners as it involves the question of credibility (Christianson v. Farmers' Warehouse Asso. supra) but the power granted and the duty imposed on the district court on such appeal is not satisfied by an inquiry as to whether there is substantial evidence in support of the *Page 455 
decision or order of the Board of Railroad Commissioners. Where trial de novo is demanded and had, the duty extends to weighing the evidence, and the exercise of independent judgment upon the evidence submitted and a determination as to where the weight or preponderance of evidence lies. This results from the plain words of the provisions of chapter 164, Laws 1933.
Appellant's counsel argues that notwithstanding the fact that the statute provides for a trial de novo, the findings of the Board of Railroad Commissioners should be given great weight, and cites in support thereof 9 Am. Jur. Carriers, page 491 et seq.
If it were not for the specific provisions of our statute there would be force in appellant's argument, but the portion of the text in 9 Am. Jur., upon which reliance is placed, is based upon certain decisions of the Supreme Court of the United States as regards the force and effect of the findings of the Interstate Commerce Commission, and the extent of judicial review of such findings. But the scope of judicial review of the orders of the Interstate Commerce Commission under the Interstate Commerce Act, and the scope of judicial review of the orders of the Board of Railroad Commissioners under chapter 164, Laws 1933, are so different that what is said in those decisions has little bearing here.
Capter 164, Laws 1933, provides for a direct appeal to the district court from an order of the Board of Railroad Commissioners. It further provides that on such appeal "the appellant shall be entitled, on demand, to a trial de novo in the district court."
The Interstate Commerce Act makes no provision for a direct appeal to a judicial tribunal from the decisions of the Interstate Commerce Commission, and "the scope of inquiry is exceedingly limited" in a suit attacking the validity of an order of the commission. 12 C.J. 138.
The validity of an order entered by the commission may be attacked only by independent action "to enjoin, set aside, annul, or suspend in whole or in part" such order. 3 Perm. Supp. Enc. U.S. Sup. Ct. Rep. pp. 343, 344. In such action, the court does not act as "an appellate rate-making commission. Its office is to see that the commission does not exceed its powers, and not to determine whether it erred in the exercise of them." Louisville N.R. Co. v. Interstate Commerce *Page 456 
Commission (C.C.) 184 F. 118. "Power to make the order, and not the mere expediency or wisdom of having made it, is the question." Interstate Commerce Commission v. Illinois C.R. Co.215 U.S. 452, 54 L. ed. 280, 30 S. Ct. 155.
"The primary jurisdiction is with the commission, the power of the courts being that of review, and is confined in that review to questions of constitutional power and all pertinent questions as whether the action of the commission is within the scope of the delegated authority under which it purports to have been made . . . . the orders of the commission are final unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power; or (3) based upon a mistake of law." 3 Perm. Supp. Enc. U.S. Sup. Ct. Rep. pp. 336-339.
On this appeal there has been certified to this Court the record that was certified to the district court by the Board of Railroad Commissioners. No statement of the case was prepared or settled, and there is no transcript of the proceedings had in the district court. The only record presented as regards the proceedings had in the district court are the recitals in the findings of fact and in the judgment. In the findings of fact it is stated:
"The above entitled action which is an appeal from the Board of Railroad Commissioners came on before the Court and the Hon. G. Grimson, Judge of said Court appointed by the Supreme Court of the State of North Dakota to hear and try the same, by consent of all the parties at Williston, N. Dak. on January 23, 1937, for trial de novo upon the record made before the Railroad Commission and certified to this Court by said Commission pursuant to said appeal, . . . and the Court having gone over the entire record before it on said appeal so certified to it by the Board of Railroad Commissioners and being duly advised in the premises and having duly considered the arguments of counsel and the briefs filed and submitted in connection therewith and the Court having reached the conclusion that at the time of said hearing before the Railroad Commission the territory for which the permit was applied for was served with reasonably adequate service by the Great Northern Railway Company and the Interstate Transportation Company and granting of a Class `A' Certificate to Russell *Page 457 
Transfer and Storage would amount to a substantial duplication of service and the Court therefore makes the following:
"Findings of fact. . . .
"4. That the appellant Great Northern Railway Company now is and has been at all times since the filing of respondent's application operating for the carriage of LCL freight, express, baggage, etc. between Minot and Williston as follows:
"Train 449 leaves Minot at 10:25 A.M. and is scheduled to arrive at Williston at 3:25 P.M.
"Train No. 3 leaves Minot at 4:10 P.M. and is scheduled to arrive at Williston at 7:45 P.M.
"Train No. 635 leaves Minot at 7:00 P.M. and is scheduled to arrive at Williston at 5:00 A.M.
"Train No. 27 leaves Minot at 7:55 P.M. and is scheduled to arrive at Williston at 10:40 P.M.
"Corresponding trains operate from Williston to Minot in the same number, in the opposite direction each day.
"Trains Nos. 3 and 4, passenger trains, handle emergency shipments of freight and express.
"The Interstate Transportation Company operates a truck service for the carriage of less than carload freight out of Minot in the morning arriving at Williston about 11:30 A.M. and another out of Minot in the afternoon and into Williston in the early evening. Corresponding trucks operate in the opposite direction from Williston to Minot daily leaving each morning and noon.
"There are therefore six daily established services between Minot and Williston.
"5. That the transportation service so being furnished by the appellants in the territory aforesaid is reasonable and adequate for the trade and business in said territory, which is very light compared with the ability and capacity of the established carriers to handle it.
"6. That the truck service proposed by the respondent would be a substantial duplication of the present service that is being given by the established carriers.
. . . . . . . . . . .
"10. That the proposed service if permitted would tend to impair *Page 458 
the present efficiency of the transportation service that is now being given by the established carriers.
"11. That the business of the territory involved does not justify the expense of the additional transportation service proposed by the respondent.
. . . . . . . . . . .
"13. That the public necessity and convenience in the territory involved do not require the truck service proposed by the respondent."
The trial judge prepared and filed a memorandum decision. This decision shows that the trial court did try the case anew. It shows a careful consideration of the evidence adduced before the Board of Railroad Commissioners, and certified to the district court, and that after weighing the evidence and considering the same in light of the findings of the Board of Railroad Commissioners, the trial court arrived at the conclusion that the order of the Board of Railroad Commissioners was not in accord with the weight of the evidence, but contrary thereto, and hence that such order must be set aside. In the memorandum decision, the trial court said in part:
"The whole record of the testimony and evidence offered before the Railroad Commission was certified to this Court. Trial was had in this Court upon that whole record. . . .
"Since the hearing in this matter before the Railroad Commissioners the Supreme Court of our State has made its decision in the case of Tri-City Motor Transp. Co. v. Great N.R.R. Co. 67 N.D. 119, 270 N.W. 100. That is a case very much similar to the one at bar, and there the Supreme Court lays down certain rules governing the actions of the Railroad Commission in granting licenses of this kind, as well as the procedure on appeal. . . .
"In that case the Court lays down the rule that the first question for the Court to consider on appeal in this kind of a procedure is `Is the decision or final order lawful? The lawfulness, under the decisions, means that the railroad commissioners had jurisdiction to render the judgment or order and that it was not unreasonable or arbitrary.' Many cases in support of that are cited.
"In determining that question this Court must exercise its own independent judgment, upon the facts shown in evidence and the law applicable thereto. The lawfulness of an order is not confined merely *Page 459 
to the procedural parts. It means also whether there is sufficient evidence to sustain the conclusions of the Board. It is not sufficient that there may be some evidence to sustain those conclusions. It must be that the weight of the evidence supports it. In that matter this Court must come to its own conclusions, based on the evidence contained in the record, giving whatever weight the findings of the Commissioners may be entitled to on disputed questions of fact which involves the credibility of witnesses testifying orally before the Commissioners. . . .
"There is no question raised on the matter of procedure in this case. . . . The question, therefore, resolves itself into a consideration of the sufficiency of the evidence to sustain the reasonableness of their order.
"Section 8 of chapter 164 Session Laws of N.D. for 1933 provides:
"`If the commission finds from the evidence that the public convenience and necessity require the proposed service or any part thereof it may issue the certificate as prayed for. . . .'
"In the Tri-City case the court lays downs the following rule:
"`The convenience and necessity which the law requires to support the public service commission's order for the establishment or extension of motor vehicle transportation service is the convenience and necessity of the public as distinguished from that of an individual or any number of individuals, and this is the primary matter to be considered in determining what constitutes such public convenience and necessity in a particular case.'
"The evidence in behalf of applicant and respondent to support this feature of the law is that of Russell himself. He already has an Interstate license from the Interstate Commerce Commission and a Special Certificate for hauling in 5000 pound lots or over. He claims that his patrons of those services have offered l.c.l. shipments intra-state, which he had refused and names Gamble-Robinson Company and Nash-Finch Company. He is supported by Mr. Harry Coffin of the Gamble-Robinson Company, who seems to be his largest customer under his present certificate. The proposed service is to leave Williston at 8 A.M. in the morning, arrive at Minot at 1 P.M., leaving Minot at 6:30 P.M., arriving at Williston at midnight, daily except Sunday. It is not to serve any intermediate points, but solely Minot and Williston. *Page 460 
Mr. Coffin testifies that this schedule fits in with his present setup so that he can have perishable merchandise brought from Minot at night, loaded on his trucks at night and shipped out to their customers early in the morning. That seems to be the main convenience shown. There is no supporting testimony from the Nash-Finch Company who are competitive wholesale dealers in Williston and Minot.
"Mr. Russell is also corroborated on this feature of the case by Mr. Meadors, proprietor of the Northern Truck Line out of Williston, and by Peter Penner, proprietor of the Overland Freight Line. Both these lines leave Williston for their respective territory about noon. These men testify that it would be more convenient for them if the freight were on hand early in the morning so that they could load their trucks in reverse order of stations. Both admit, however, that they have taken freight from the Inter-state arriving in Williston about 11:30 A.M.; that they have never refused such freight and there is only one instance of delay given.
"The rest of the witnesses in support of the applicant and respondent are mostly local Williston men. They testify that in an emergency such service would be convenient. A fair inference from the testimony, however, is that the main reason they support the application is that Russell is a Williston man and that they would prefer to do business with a fellow townsman. That is an admirable spirit and shows the reason why Williston grows and succeeds, but can hardly be considered as evidence to show the necessity and convenience of the service for the public. All the witnesses admit there is no need of new services going east from Williston, the present services being adequate.
"On behalf of the appellants, it is shown that the Great Northern has a train leaving Minot at 10:25 A.M. daily, handling car loads and trap car service, meaning shipments of 6000 pounds or over, and arriving at Williston at 3:25 P.M.; another leaving Minot at 4:10 P.M., daily, handling l.c.l. freight, and express, delivered at Minot freight house up to 3:15 P.M., arriving at Williston 7:45 P.M., daily; another leaving Minot at 7:55 P.M., handling express, arriving at Williston 10:40 P.M., and finally a daily freight train handling all classes of freight service leaving Minot at 7 P.M., arriving at Williston at 5 A.M., daily except Sunday. Corresponding trains leave *Page 461 
Williston for Minot daily, but as that service is admitted adequate they need no further consideration.
"Then the Interstate Transportation Company is shown to have two services daily between Williston and Minot. One leaves Minot at 7 A.M., arriving in Williston at 11:30 A.M. and another leaving Minot at 1:30 P.M. arriving at Williston at 6 P.M., this is a combined passenger and freight service. That makes a total of six services daily between Minot and Williston. The evidence shows that there have been no shipments refused because of inadequate service. Between January 1st., and September 15th, 1936, the Great Northern handled l.c.l. business from Minot to Williston amounting to 1,936,357 pounds. There is in the testimony only one complaint of delayed shipment over the Great Northern. The Interstate Transportation Company, during June 1936, handled 42,238 pounds of l.c.l. freight between Minot and Williston, July 63,264 pounds, August 50,512 pounds. There also appears in the testimony only one complaint against it for delayed service.
"In addition to this is the special certificate service given by Russell between these two points and over which, apparently, most of the so-called pool car freight has in the past been hauled for Gamble-Robinson Company to meet the requirements of their present set-up for loading their trucks at nighttime.
"Williston is a city of approximately six thousand inhabitants and contains other wholesale establishments besides Gamble-Robinson, and businesses of all kinds. It is a distributing and trade center for that part of the state and Eastern Montana."
. . . . . . . . . . .
"It appears, . . . from the testimony, that the only convenience and necessity shown in the evidence is that of some individuals rather than that of the public.
"Taking into consideration the size and population of Williston and its territory, the amount of freight handled by the present carriers and the lack of complaints on their services, it seems the public is well served by the appellants. The convenience and necessity of the public as distinguished from that of individuals is not shown by the weight of the evidence.
. . . . . . . . . . . *Page 462 
"In the Tri-City case our Supreme Court lays down the following rule:
"`In passing upon the question of the granting of a certificate of public convenience and necessity, the Railroad Commission is required by law to take into consideration existing travel, the increased cost of maintaining the highway concerned, the effect on other established forms of transportation, and existing transportation facilities, and if it appears from the evidence that the service furnished or that could be furnished by existing transportation facilities is reasonably adequate, the order granting the certificate is unlawful and contrary to mandatory provisions of the statute.'
"The proposed service is to be over highway number 2 practically all the way from Minot to Williston and it parallels the Great Northern Railway and is over the same highway as the Interstate Transportation Company. It proposes night service. This will necessarily be a burden upon the highway and the traffic on the highway. Such traffic at night is more inconvenient to the traveling public in addition to causing increased cost of maintenance of the highway.
"The Great Northern Railway has four services each way over this particular route. The Interstate Corporation two. Both are shown to have adequate facilities for handling much more freight than they now do. All freight diverted from them necessarily lessens their income and if there is sufficient diversion of such freight it would mean abandonment of some of the present services, or an increased cost to the public. After all the public has to pay for it all. . . .
"The court has, therefore, come to the conclusion that under the law as laid down in the Tri-City case, no sufficient showing of convenience and necessity to the public for this new service has been made; that there appears to be adequate freight service now between Minot and Williston; that the new service would only endanger that present service, as well as be an increased and unnecessary burden upon the highway and upon present travel and forms of transportation."
A careful consideration of the evidence certified as a part of the record on this appeal, leads us to the conclusion that the summarization and analysis of the evidence made by the trial court in its memorandum decision are correct, and that the findings of the trial court are in accord with the weight of the evidence. *Page 463 
It next contended that the Board of Railroad Commissioners has not established regulations under the Provisions of chapter 164, Laws 1933; that such law became effective July 1st, 1933, and that the regulations adopted relating to motor carriers were adopted prior to the date such law became effective. And upon this premise it is argued that the Board of Railroad Commissioners was without authority to grant the Class "A" certificate applied for, and that consequently the appellant was "free to pursue his common carrier activities until such time as rates, classifications, and regulations were properly adopted pursuant to law."
This contention cannot be sustained. Under the express provisions of § 8, chapter 164, Laws 1933, it is "unlawful for any common motor carrier to operate within this State without first having obtained from the Commission a certificate of public convenience and necessity." This clearly contemplates that after the law became effective, no common motor carrier should operate without first having obtained the prescribed certificate. Appellant did apply to the Board of Railroad Commissioners for such certificate. The application was heard and granted. An appeal was taken to the district court. In the district court the question was not whether the applicant was entitled to a certificate under the regulations adopted by the Commission — the question was whether the facts shown entitled him to such certificate under the provisions of the statute. That was the question presented to, and decided by, the district court, and that is the question presented for determination here.
In his brief, appellant says that there is available at this time certain evidence tending to show the public need and convenience of the proposed service, which evidence was not available at the time of the hearing before the Board of Railroad Commissioners. This is a matter which this court may not consider on this appeal. The only questions that properly may be considered on this appeal are those presented on the record that was certified on this appeal. In that record, no reference is made to any newly discovered evidence. The question of the introduction of additional and newly discovered evidence is a matter that must be presented first to the Board of Railroad Commissioners. *Page 464 
It follows from what has been said that the order of the district court must be, and it is, affirmed.
BURR, NUESSLE, and MORRIS, JJ., concur.
SATHRE, J., being disqualified, did not participate.