# DENVER & R. G. W. R. CO. et al. v. PUBLIC SERVICE COMMISSION et al.
## SIMS et al. v. SAME.

Nos. 6126, 6127.   Decided March 21, 1940.   (100 P. 2d 552.)

No. 6126:

*Irvine, Skeen, Thurman & Miner* and *K. Tracy Power,* all of Salt Lake City, *DeVine, Howell & Stine,* of Ogden, and *F. M. Orem, Van Cott, Riter & Farnsworth,* and *George H. Smith,* all of Salt Lake City, for plaintiffs.

No. 6127:

*Irwin Clawson, Herbert B. Maw,* and *Harry D. Pugsley,* all of Salt Lake City, for plaintiffs.

*Joseph Chez,* Atty. Gen., and *John D. Rice,* Asst. Atty. Gen., for defendants.

PRATT, Justice.

These two cases we shall consider together. In view of the number of litigants involved, we shall, for the sake of brevity, designate the parties as follows: The Transfer Company, as applicant; the Railroads, as protestants; and the Utah Public Service Commission, formerly the Public Utilities Commission, as the Commission. The Transfer Company is defendant in one case, No. 6126, and plaintiff in the other, No. 6127; the Railroads are plaintiffs in one, No. 6126 and defendants in the other, No. 6127; and the Commission a defendant in both cases.

The facts, so far as necessary to the decision, are these: April 3, 1936 the Transfer Company applied to the Commission for a contract motor carrier permit under the provisions of Chapter 65, Laws of Utah 1935. They recited in the application that they proposed to operate motor vehicles for the transportation of property on occasional hauls over *all* the highways of the State; that on March 15, 1933, and for 40 years prior thereto they had been engaged in that business; and that since that date (March 15, 1933) they had carried on that business under temporary permits. The provision of Chapter 65, Laws of Utah 1935, pertinent to our decision, reads as follows:

"Section 9. *Contract Carrier—Intrastate Commerce—Permit.*

"It shall be unlawful for any contract motor carrier to operate as a carrier in intrastate commerce without having first obtained from the commission a permit therefor. The commission shall grant on application to any applicant who was a contract motor carrier as defined by this act on the fifteenth day of March, 1933, a permit to operate as a contract motor carrier on the same highways and to carry on the

same type of motor service as he was prior to said date. Where said applicants were operating on all the highways of the state prior to said date, the permit shall authorize them to continue to operate on all of said highways. The commission shall furthermore grant on application to any applicant who received a permit to operate as a contract motor carrier between the fifteenth day of March, 1933, and the date on which this act takes effect, a permit to continue to operate in the same manner and over the same highways as the terms of said permit allowed.

"The commission upon the filing of an application for a contract motor carrier's permit by any other person than those referred to above in this section shall fix a time and place for hearing thereon and shall give the same notice as provided in section 6 hereof. The commission shall also subpoena a member of the state road commission to be present at said hearing and said member or representative designated by said road commission shall offer testimony as to the character of the highway over which said contract motor carrier proposes to operate and the effect thereon; and upon the traveling public using the same. If, from all the testimony offered at said hearing, the commission shall determine that the highways over which the applicant desires to operate are not unduly burdened; that the granting of the application will not unduly interfere with the traveling public; and that the granting of the application will not be detrimental to the best interests of the people of the state of Utah and/or to the localities to be served, the commission shall grant such permit; *provided*, however, that *any person aggrieved* by the action of the commission· may, within thirty days after notice of the decision of the commission of which he is aggrieved, bring an action in the district court of this state for a plenary review thereof, in which said action the applicant for a contract motor carrier permit shall be plaintiff and the commission defendant. The place of the trial subject to the power of the court to change the same as provided by law shall be in the county in which the applicant, plaintiff in the action, resides. The commission shall be served with process as in other cases and within ten days after the commencement of said action, which shall operate to stay all further proceedings pending the decision of the district court during which pendency the commission shall grant the applicant a temporary permit to operate as a contract motor carrier. *The hearing in the district court shall proceed as a trial de novo.* The district attorney of the county in which such action is filed shall represent and defend the action on behalf of the defendant, the commission. * * * The commission shall act in accordance with said judgment." (Italics added.)

On the same day the application was filed, the Commission granted it, and issued permit No. 125 authorizing the Transfer Company to engage in the transportation of property by motor vehicle over all the highways of the state. The action of the Commission in so granting the application was apparently upon the theory that applicants, by reason of their previous engagement in that line of work, were, under section 9 quoted above, entitled to the permit as a matter of right and without hearing. In the case of *McCarthy et al.* v. *Public Service Commission et al.*, 94 Utah 304, 77 P. 2d 331, this court, upon application of the Railroads, and after argument and the submission of briefs, directed a hearing upon the application of the Transfer Company for such a permit.

After the hearing, in which the parties were present and submitted evidence, the Commission on January 19, 1939, made its findings and an order granting the application with certain limitations. Within the time allowed by law, both sides to the controversy filed applications for rehearing. Without further notice or hearing, and without taking further testimony, the Commission (with one commissioner dissenting) issued an amended order. The Commission then denied the applications for rehearing. Both parties filed their applications for rehearing as to the amended order. These applications were also denied. The Railroads filed an application in this court for a Writ of Certiorari (Case No. 6126). The Transfer Company also filed its application in this court for a Writ of Certiorari (Case No. 6127).

The cases were argued together and briefs have been submitted in each. With permission of this court, the Commission filed briefs in each case.

One of the questions submitted to us is this: Had this court, upon writ of certiorari, jurisdiction to hear these matters? This question is not decided in the McCarthy case cited above. Apparently it was not raised by the parties. However that may be, it is directly before us now. The an-

swer to the question calls for an interpretation of that part of Section 9 following the word *provided.* If we find therein a plain, speedy and an edequate remedy, we should not take cognizance of these two cases upon these writs. Section 104-67-2, R. S. U. 1933; *County Board of Equalization of Kane County* v. *Tax Commission,* 88 Utah 219, 50 P. 2d 418. Section 76-6-16, R. S. U. 1933, which provides for the review by writ of certiorari (which section is applicable generally to all procedure before the Public Service Commission), should, under such circumstances, be considered applicable to such cases before the Public Service Commission as are not otherwise covered by a plain, speedy and an adequate remedy in the ordinary course of law.

There are three classes of applicants who may get permits under Section 9: Those engaged in the contract carrier business on March 15, 1933; those granted a permit between that date and the effective date of the act, December 31, 1935; and new applicants. Apparently, acting upon the theory that applicants under the first two classes would receive their permits as a matter of course, the Legislature wrote the procedural provisions only in the paragraph pertaining to new applicants. However, as we held in the McCarthy case, supra, that regularity of procedure required hearings as to protested applications under the first two classes, it follows that the procedural provisions for carrying the matters into the district courts are applicable to them as a method of reviewing those hearings.

What, then, is meant by a *plenary review* of the action of the Commission which *shall proceed as a trial de novo?* These same words are in italics in the quotation of Section 9, above.

The expression "trial de novo" has been used with two different meanings (3 Am. Jur. p. 356, sec. 815) : (1) A complete retrial upon new evidence; (2) a trial upon the record made before the lower tribunal. Locally we find an example of the first in Section 104-77-4, R. S. U. 1933, covering appeals from the justice court to the district

court—the case is tried in the district court as if it origi-
nated there. An example of the second meaning we find
locally in our treatment of equity appeals wherein we say
that the parties are entitled to a trial de novo upon the rec-
ord. *Jensen et al.* v. *Howell et al.*, 75 Utah 64, 282 P. 1034;
*Dahlberg* v. *Dahlberg*, 77 Utah 157, 292 P. 214; *Corey* v.
*Roberts*, 82 Utah 445, 25 P. 2d 940, 941; *Sharp* v. *Bowen et
al.*, 87 Utah 327, 48 P. 2d 905. We invite attention, also, to
the Missouri case of *State ex rel. Case* v. *Public Service
Commission*, 298 Mo. 303, 249 S. W. 955, 960. Which of
these two meanings is contemplated by Section 9 quoted
above?

Under the procedure as applied prior to the enactment
of Chapter 65, Laws of Utah 1935, of which Section 9 is a
part, the court's review of the action of the Commission was
limited to questions of law; the Commission's findings
of fact were final and not subject to review. See
Chap. 47, Art. V, sec. 15, Laws of Utah 1917; also
Section 4834, Compiled Laws of Utah 1917; and Sec. 76-6-
16, R. S. U. 1933. We have passed upon this question in
the following cases: *Salt Lake City et al.* v. *Utah Light &
Traction Co.*, 52 Utah 210, 173 P. 556; *Bamberger Electric
R. Co. et al.* v. *Public Utilities Commission of Utah*, 59 Utah
351, 204 P. 314; *Jeremy Fuel & Grain Co. et al.* v. *Public
Utilities Commission*, 63 Utah 392, 393, 226 P. 456; *Los
Angeles & Salt Lake R. Co.* v. *Public Utilities Commission,
of Utah et al.*, 80 Utah 455, 15 P. 2d 358; and *Los Angeles
& S. L. R. Co.* v. *Public Utilities Commission et al.*, 81 Utah
286, 17 P. 2d 287. But in the 1935 law involved here, the
Legislature has said that the court's review of the Commis-
sion's action shall be "plenary"—a *plenary review*, a full
review, a complete review—and to make certain of this kind
of a review, it provided that it "shall proceed as a trial de
novo." To review an action is to study or examine it again.
Thus, "trial de novo" as used here must have a meaning
consistent with the continued existence of that which is to
be again examined or studied. If, in these cases, the first

meaning were applied to the use of the term "trial de novo" then one could not consistently speak of it as a review, as the Commission's action would no longer exist to be re-examined or re-studied. There would be no reason for making the Commission a defendant to defend something that had been automatically wiped out by instituting the district court action.

What the Legislature has done by Section 9 is to increase the scope of the court's review of the record of the Commission's action to include questions of fact as well as questions of law. A submission to the court of the application, together with testimony other than the record of testimony before the Commission was not contemplated. The Legislature had in mind the second meaning when it used the word "trial de novo" here.

For cases discussing similar principles we invite attention to the following: *Tri-City Motor Transp. Co.* v. *Great Northern Ry. Co. et al.*, 67 N. D. 119, 270 N. W. 100; and *Russell* v. *Great Northern Ry. Co.*, 68 N. D. 447, 281 N. W. 239.

Those cases holding a contrary view seem to be based upon a differently worded statute: *Texport Carrier Corporation* v. *Smith et al.*, U. S. D. C. Texas, 8 F. Supp. 28; and *Railroad Commission of Texas et al.* v. *Rau*, Tex. Civ. App., 45 S. W. 2d 413.

There are some decisions, however, we wish to distinguish from our own. They are those wherein the statutory provisions are in the nature of a suit to set aside the action of the public service body. In those cases, of course, testimony before the court is contemplated the same as in any suit to set aside a judgment. But, as is said in the following Kansas case, such an action is not contemplated as a review of the action of the public service body: *Atchison, T. & S. F. Ry. Co.* v. *Public Service Commission*, 130 Kan. 777, 288 P. 755, 757; R. S. 1923, 66—118. Quoting from their statute:

"* * * within thirty days from the making of such order, commence an action in a court of competent jurisdiction, against the

public utilities commission as defendant, *to vacate and set aside* any such order, finding or decision of the public utilities commission * * * and such action shall *be tried and determined as other civil actions.*" (Italics added.)

The court said:

"The appellant availed itself of the relief prescribed by statute to have the order set aside and to enjoin its enforcement. That proceeding was not an appeal, neither was it one for review of the former hearing, but it was an application to a judicial tribunal for a trial de novo of the rights involved in the hearing before the commission." See, also, *In re Burnette*, 73 Kan. 609, 85 P. 575.

The Legislature having provided a means of reviewing the Commission's action in cases arising under Chapter 65, Laws of Utah 1935, in which all questions submitted here can be properly covered, as well as questions of fact, upon which we could not pass under these writs, we are of the opinion that these writs should be dismissed.

One more point before closing. We see no limitation upon the meaning of "any person aggrieved" by reason of the requirement that applicant shall be named plaintiff and the Commission named defendant in the district court action. In the McCarthy case cited above, we held that protestants were entitled to a hearing. Naturally, they would be entitled to a review of that hearing in case it terminated to their dissatisfaction. In Section 76-6-16, R. S. U. 1933, it is provided that "the applicant or any party * * * deeming himself aggrieved" may apply for a writ. It is quite evident that the Legislature did not have in mind that *an aggrieved party* meant only an applicant.

In view of our interpretation of Section 9, it is unnecessary to discuss the constitutional question raised by the Commission.

For the reasons given, the writs are vacated and set aside. Each party shall bear his own costs.

MOFFAT, C. J., and LARSON, J., concur.

McDONOUGH, Justice.

I concur in the result.

WOLFE, Justice (dissenting in part).

The "provided however" part of the last paragraph of Section 9, Chapter 65, Laws of Utah 1935, appears, at first, to apply only to those applicants who cannot take advantage of the "grandfather" provisions of the section. But I agree that it applies to any party aggrieved who has legal standing in the matter, *McCarthy* v. *Public Service Commission*, 94 Utah 304, 77 P. 2d 331, and that it applies also to the "grandfather" clauses of Sec. 9. The history of the legislation points that way. The construction also bears this out because the words "provided however" do not restrain or modify what precedes nor exempt anything from its operation. These words can be ignored and the part on procedure for "review" be read as if it started "any person aggrieved * * *." Thus read it applies to all classes of controversies or applications under Sec. 9.

I do not agree that the "provided however" clause should be construed as limiting the scope of "review" to the record. While the word "review" is used, every other provision of the procedural portion of the section points to trial entirely independent of the record before the Commission. The aggrieved party must "bring an action in the district court." This language does not sound in appeal. There is no provision for certifying the record; no appeal provisions. Furthermore, the Commission must be "served with process as in other cases and within ten days after the commencement of said action." This does not sound in appeal. The Commission is not apprised of an "appeal" by notice and required to certify the record. Its notification comes from a summons. The place of trial may be changed as in other cases—itself a strange procedure in case of an appeal either of fact or law. And lastly, "the hearing in the district court shall proceed as a trial de novo" not as a trial de novo *on the*

*record.* And a copy of the judgment shall be filed in the office of the Commission. There is no provision for a remittitur nor any provision for a judgment of the District Court that operates on a decision of the Commission by affirming or reversing it. The judgment supersedes the finding of the Commission and the "commission shall act in accordance with said judgment," not with its own, as affirmed, modified, or rearrived at after reversal. Under these preponderating conceptions the term "plenary review" must be taken to mean what it means in statutes like that of Texas where the "action" is to "set aside any decision, rule, order, or act" with which the party is dissatisfied. *Texport Carrier Corporation* v. *Smith,* D. C. 8 F. Supp. 28, 33. Our statute involves the setting aside of the decision of the Commission by superseding it.

In the Texport case it was stated:

"In such a proceeding the trial de novo in the sense that while the issue is as to the reasonableness of the Commission's order, and it stands unless overthrown, whether it is overthrown or not is determined not upon the record before the Commission, *but upon the evidence adduced in the trial court.* If this is sufficient to overthrow the prima facies attending the Commission's orders, plaintiff prevails. If it is not, the order stands." (Italics added.)

See also *Railroad Commission of Texas* v. *Rau,* Tex Civ. App., 45 S. W. 2d 413, 415, where the court differentiates the procedure in Texas from that of other states having different statutes on the ground that the Texas statute provides that the proceeding " 'shall be tried and determined as other civil causes in said court.' " Exactly the same reasoning applies to our statute. The same interpretation was given to the Kansas statute which provided that a person dissatisfied might *"commence an action* in a court of competent jurisdiction, against the public utilities commission as defendant, to vacate and set aside any * * * order, finding or decision of the public utilities commission * * * and such action shall be tried and determined as other civil actions." It was held that the trial was one de novo with any

competent evidence admissible and "not a mere appeal." *Atchison, T. & S. F. Ry. Co.* v. *Public Service Commission of Kansas*, 130 Kan. 777, 288 P. 755, 757. Also *In re Burnette*, 73 Kan. 609, 85 P. 575.

The distinction becomes immediately clear when we compare the statutes of Texas, Kansas and our own with those of North Dakota where an *"appeal* from the order or decision  *  *  * may be taken to the court and a trial de novo obtained."* In such cases the record goes up and the court weighs the evidence as it appears in the record—as we do on appeal in an equity case. The review is not to consider new evidence but is for the purpose of determining whether under the evidence taken by it the commission came to what the court conceives to be the proper conclusion. *Tri-City Motor Transp. Co.* v. *Great Northern Ry. Co.,* 67 N. D. 119, 270 N. W. 100; *In re Russell,* 68 N. D. 447, 281 N. W. 239, 243. In Missouri it is held that the court may weigh the evidence as in equity, on a writ of review for the purpose of having the reasonableness or lawfulness of the commission's order determined. Laws of Mo. 1913, Sec. 111, p. 641; *State ex rel. Case* v. *Public Service Commission,* 298 Mo. 303, 249 S. W. 955, 960, and cases there cited. The prevailing opinion adopts the procedure of the North Dakota statute. I think our statute went further because its language is quite different.

No case has been cited which restricted the scope of a trial de novo to the equivalent only of an equity review, under language providing for the "bringing of a new action in the courts."

It is said that to permit an issue of fact to be retried would make the proceedings before the Commission a useless preliminary as practically everyone would resort to the courts and use the Commission to run a preliminary heat. This is by no means to be assumed. In many cases the evidence on the question of whether the applicant came under the "grandfather clause" might be so convincing as to make further proceedings a mere long shot. But be the procedure

in Sec. 9 wise or foolish, if it is within the power of the Legislature to pass the law, we are functus officio.

As to power: The Attorney General, arguing for the Commission, contends that under Article 5, Sec. 1 of our Constitution, the portion of Sec. 9 of Chap. 65 which provides for a plenary review and a trial de novo before a District Court is unconstitutional because it constitutes an unlawful delegation of legislative powers to the judiciary. Article 5, Sec. 1 of the Utah Constitution provides that "no person charged with the exercise of powers properly belonging to one of these departments [Legislative, Executive, and Judicial], shall exercise *any* functions appertaining to either of the others, except in the cases herein expressly directed or permitted." (Italics added.) The majority seem to think that they escape this question of separation of powers because of the construction they give to Sec. 9, Chap. 65. Their opinion states: "In view of our interpretation of Section 9, it is unnecessary to discuss the constitutional question raised by the Commission." But whether Sec. 9 is interpreted as in the prevailing opinion or as in this opinion, the question remains. It is not so easily evaded. It makes no difference whether we interpret Sec. 9 to mean that the district court must read the record and weigh the evidence or take evidence anew and weigh it. In either case the court makes *its* conclusions on the evidence submitted to it. This is a function different in nature from that of examining the record to see if the commission regularly or properly pursued its authority or acted within its authority. Such latter function would be judicial even if the Commission's function were legislative. Under proper procedure a court may even determine whether a legislature has acted within its power; hence, it acts judicially when it determines the basic question of whether a legislative agency acted within its power. But if the Commission was exercising a legislative function in determining the factual matter of whether Sims was entitled to a license, certainly the district court in determining that fact, whether on the rec-

ord made by the Commission or by evidence taken independently, is exercising a legislative function. So, in any event, the problem is not evaded. But in attempting to escape the question, this court, by a single line, impliedly holds that in every case when the district court only weighs the evidence on a record made by a Commission, it is exercising a judicial function. I wish the problem were as simple as that. Certainly if the end act which the Commission was required to do, and for which the record was made, was legislative then the function that the court was to perform by weighing the evidence in order to accomplish the same thing, was legislative. The court must make a judgment and "a copy of the judgment therein shall be filed in the office of the commission. The commission shall act in accordance with said judgment."

I am compelled to handle the problem presented by the Attorney General in quite a different manner.

Much has been written concerning the delegation and separation of powers. It is one of the most troublesome fields of law. Mr. Kenneth C. Davis in a most comprehensive article in 44 West Virginia Law Quarterly, 270 (June 1938) entitled "Judicial Review of Administrative Action in West Virginia—A Study in the Separation of Powers," has given us a masterful and critical analysis of the West Virginia cases on review from Administrative Agencies. The contradictions and inconsistencies in thought and the hopelessly irreconcilable decisions due to the attempt of the courts to label the powers of administrative bodies under a constitutional provision somewhat like our own, are, in Mr. Davis' article, given dramatic exposition. I shall not permit myself to become morassed in that Stygian bog. No modern government can run without administrative agencies and many of these agencies in order to function in the field to which they are allotted must exercise executive, legislative, and judicial powers. There is no other way for governance under modern conditions. And the problem is not solved by calling a judicial power quasi-judicial, or labeling a power as legislative-

administrative. The Industrial Commission, in determining whether an applicant was the wife of a deceased employee, exercises a function every bit as judicial in nature as does a court when it determines whether an applicant for letters of administration is the widow of a decedent. The Bureau of Registration in determining whether a doctor has committed an abortion and is therefore guilty of unprofessional conduct, determines exactly the same question as does a jury when it determines whether the doctor has committed the crime of abortion. But the mode and *end purpose* are different. To quote from Mr. Davis' article, supra:

"More than a century ago Mr. Justice Story discerned the pitfall with respect to separation of powers which has caused the West Virginia court so much difficulty: '* * * a perfect separation is occasionally found supported by the opinions of ingenious minds, dazzled by theory, and extravagently attached to the notion of simplicity in government * * *.' "

Even in the instant case the dilemma presents itself. If the determination of whether an applicant is entitled to a permit to transport goods as a contract motor carrier is a legislative act, then at best the courts can do no more than determine whether the Commission has acted within its powers. If it is a judicial act then the courts may review it as an equity case or even take evidence anew. But would not the meticulous lawyer ask, what right has the legislature to give an administrative body judicial powers?

Most governmental action—as indeed most human activity—involves the exercise of judgment, then of will, leading to action consequent on that judgment. Therefore, because most actions are preceded by the exercise of the mental faculty of judgment and will, in that sense, all legislatures, courts, commissions, executives, agencies, bureaus, and all instrumentalities functioning governmentally exercise powers which have been labeled as judicial, legislative and executive. We know that Art. 5, Sec. 1 of our Constitution could not have meant strictly to separate and limit the exercise of such functions or modern government would have

to cease. Judicial, legislative, and executive are not to be defined in terms of the nature of the mental processes involved which contribute to their fulfillment nor even by the incidental outward acts which accompany their performance. We think of legislative acts as those which were historically and traditionally performed by the legislature, and those as judicial which have been traditionally looked on as being peculiarly functions of the court. See *Tite* v. *Tax Commission,* 89 Utah 404, 57 P. 2d 734. That is, we know, that a court cannot make a law for general application although when it makes a rule for court administration it really makes a law of limited application but incidental to its end purposes. Likewise, we know that the legislature cannot try a civil case in law or equity or try a criminal case and impose a penalty. But it can condemn property under the power of eminent domain and even determine its value. But it has been the practice to delegate the power to fix value to the courts. Also, in times gone by, state legislatures tried divorce cases and, absent any prohibition against special legislation, passed special laws granting privileges to specified corporations and individuals, and, in some cases, actually determined the value of property for taxation and fixed the levy. So, if we accepted the purely historical and traditional tests, all of these would have to be denominated legislative. *Paramino Lumber Co. et al.* v. *William A. Marshall, Deputy Com'r,* March 11, 1940, 60 S. Ct. 600, 84 L. Ed. 545. If the historical and traditional basis for testing the nature of the power, for the purpose of Art. 5, Sec. 1, were confined to our own jurisdiction, we would eliminate divorce actions as having any aspect of legislative, but outside of that, we would find that our Utah courts and legislature have performed generally and ordinarily the functions which those instrumentalities have performed in American jurisprudence for more than a century. It is quite likely that all that Art. 5, Sec. 1 intended to do was to prevent either the legislature or judiciary from performing those functions distinctly and notoriously belonging to the

other department. The difficulties arose when agencies necessarily were created to perform governmental functions. The movement for extensive administrative regulation is comparatively new. Dean James M. Landis places its beginning at about 1905. See Proceedings New Hampshire Bar Assn. 1938-1939 p. 83 et seq. By this development acts, in the narrow sense, essentially legislative and judicial were unconsciously fused under the term administrative. This was perhaps made necessary largely because of the very requirement that there be a separation of powers. It was realized that the legislature could not perform certain acts except in conjunction with other acts, in obtaining desired governmental control over the matter which it was necessary to regulate. Necessity is the mother of the administrative agency. No one stopped to analyse the intrinsic nature of the powers which it was necessary to give to administrative agencies to enable them to carry out their functions. It was impossible to establish an agency for the legislative part of the whole administrative function, and run to the courts to have them perform what may in nature have been judicial. So, instead of calling an agency legislative or judicial it was denominated administrative or quasi-judicial. But honest minds recognized that a change in labels did not effectuate a change in the nature of the power. See the excellent discussion in *State ex rel. Wisconsin Inspection Bureau* v. *Whitman*, 196 Wis. 472 at page 481 et seq., 220 N. W. 929; also *Ferretti et al.* v. *Jackson et al.*, 88 N. H. 296, 188 A. 474. And these agencies functioned in blissful ignorance of their hybrid nature until lawyers attempted to pick out the ingredients of administrative acts and to label them as executive, judicial or legislative, measured alongside of the sort of things legislatures and courts traditionally did. Having labeled the various functions, the next step was to call attention to certain constitutional provisions such as ours, the language of which required strict separation of powers, and to invoke constitutional sanctions against such agencies. But when the early American constitutions were drafted,

the framers were under Montesquieu's spell. It was thought that there would be a sort of automatic protection to the people if each department would check and balance the others. It was not seen that when the complexities of our civilization increased, strict separation of powers might act as a checkmate to, rather than as a check on, government. And, as we know, our later constitutions somewhat blindly have been patterned after those early ones.

Says Professor Davis:

"The soundness of Montesquieu's theory, limited as Madison and Story limited it, is not questioned: 'His [Montesquieu's] meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department of the government is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted.'"

And Montesquieu's own countryman, Professor Larnaude in 7 Congress of Art and Science 602, 613 interpreted the doctrine of Separation of Powers:

"'The separation of powers is merely a formula, and formulas are not working principles of government. Montesquieu had chiefly aimed to indicate by his formula the aspirations of his times and country. He could not and did not wish to propose a definite and permanent solution of all the questions brought up by the government of men and their long-felt longings for fairness and justice.'"

But the question presents itself whether the matter of separation of powers may be considered as being only a formula or policy where there is an express constitutional provision prohibiting one department from exercising the functions of another. The problem becomes intensified when in the Constitution the word "any" is used as is done in Art. 5, Sec. 1. But certainly this provision should be given the broadest construction possible. If possible, constitutional provisions must be construed so as to permit government to work under contemporary conditions.

The matter of determining whether Sims should have a permit to conduct the business of contract motor carrier may

be, in nature, legislative. Art. XII, Sec. 12 of our Constitution, makes all railroads and other transportation companies subject to legislative control. Whether this entirely excludes judicial control or whether the legislature, by delegating to the judiciary the right to decide whether applicants may transport in a certain manner, with power to reclaim such right, in that way exercises its constitutional control—may rest in doubt. True it is that to us falls the duty of saying whether the power is constitutionally granted to the courts. But, as has been many times reiterated by the courts: It is not the function of the courts to set aside an arrangement made by the legislature unless it is a clear and flagrant violation of the principle of separation of powers. I cannot say beyond peradventure of a doubt that the power is so distinctively legislative as to preclude its being given to the courts even though I may believe that it is unwise to delegate to the court instead of an experienced commission, the ultimate duty of determining, on the facts, whether the applicant is entitled to a permit. In consequence, at least until I am better advised, I hold the statute to be constitutional.

"Generally speaking, it may be said that when a power is not peculiarly and distinctly legislative, executive, or judicial, it is within the authority of the legislature to determine where its exercise shall be vested." Vol. 2, Willoughby on the Constitution. (1910) Sec. 743, p. 1264.

Reference is made to "Power of Congress over Procedure in Criminal Contempts in 'Inferior' Federal Courts—A Study in Separation of Powers" by Frankfurter and Landis, 37 Harvard Law Review, 1010, 1012, to 1016. Also, to a very clear exposition entitled "Administrative Commissions and the Judicial Power" by Ray A. Brown, 19 Minnesota Law Review, 261.

Since I cannot, at this time, say that the proviso clause of Sec. 9 is unconstitutional, I must agree that it gives an adequate remedy at law in this particular kind of case where the decision must rest on evidence. But I think that where the question is, whether the Commission acted without power

or denied a definite right, as in the case of *McCarthy* v. *Public Service Commission,* supra, rather than a testing of whether a court would come to the same factual conclusion, there could still be a review of such questions arising under Sec. 9 under the provisions of Sec. 76-6-16, R. S. U. 1933.